**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**MAY 19 2004**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

UNITED STATES COURT OF APPEALS

TENT CIRCUIT

---

GARRY THOMAS ALLEN,

      Petitioner-Appellant,

v.

MIKE MULLIN, Warden, Oklahoma,

      Respondent-Appellee.

No. 02-6146

---

**Appeal from the United States District Court**
**for the District of Western District of Oklahoma**
**(D.C. No. CIV-98-1754-R)**

---

Randy Bauman, Assistant Federal Public Defender (Patrick J. Ehlers, Jr., Assistant Federal Public Defender on the briefs), Oklahoma City, Oklahoma, for Petitioner-Appellant.

David M. Brockman, Assistant Attorney General, Criminal Division (W.A. Drew Edmondson, Attorney General of Oklahoma with him on the briefs), Oklahoma City, Oklahoma for Respondent-Appellee.

---

Before **KELLY, HARTZ** and **O'BRIEN**, Circuit Judges.

---

**O'BRIEN**, Circuit Judge.

---

      Garry Thomas Allen was convicted of murder in the first degree in

violation of Okla. Stat. tit. 21, § 701.7,[1] for which he was sentenced to death. After extended state court proceedings, he filed a petition for writ of habeas corpus with the federal district court under 28 U.S.C. § 2254. The district court held a limited evidentiary hearing and denied relief. He appeals four issues certified for review, each turning on his competency. Exercising jurisdiction under 28 U.S.C. § 2253, we affirm.

## I.    Background

The essential facts of November 21, 1986, as set forth by the district court, are undisputed on appeal:

> Petitioner shot and killed his girlfriend, Gail Titsworth (Titsworth), four days after she moved out of the home they shared with their sons, six-year old Anthony and two-year old Adrian. In the week leading up to the shooting, Petitioner and Titsworth had several angry confrontations when Petitioner tried repeatedly to persuade her to move back in with him. On November 21, 1986, Titsworth went to pick up her sons at their daycare center. Petitioner came into the daycare center shortly after Titsworth arrived. Petitioner and Titsworth argued briefly and then Petitioner left.
>
> A few minutes later, Titsworth left the daycare center with her sons and went into the parking lot. As she was opening the door to her truck, Petitioner came up behind her and shut the door. Titsworth once again tried to get into the truck but was prevented from entering it by Petitioner. The two argued briefly and Petitioner reached down

---

[1]"A person commits murder in the first degree when that person unlawfully and with malice aforethought causes the death of another human being. Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." OKLA. STAT. ANN. TIT. 21, § 701.7A.

into his sock, retrieved a revolver and shot Titsworth twice in the chest. It is unclear whether Titsworth was holding her youngest son at the time of the shooting or had picked him up immediately thereafter. After she was shot, Titsworth began begging Petitioner not to shoot her again and then fell to the ground. Petitioner asked Titsworth if she was alright. He then lifted up her blouse, apparently attempting to figure out the extent of her injuries.

At the time of the shooting, some of the daycare employees were in the parking lot and several of the children were in a van parked a few feet from Titsworth's truck. After the shooting, Titsworth managed to get up and began running toward the building along with a daycare center employee. As they were going up the steps leading to the front door, Petitioner shoved the daycare worker through the door and pushed Titsworth down onto the steps. Petitioner then shot Titsworth two times in the back at close range.

Officer Mike Taylor of the Oklahoma City Police Department was on patrol in the area and responded to the 911 call within minutes of the shooting. As Officer Taylor was nearing the daycare center, a witness to the shooting directed him to an alley where Petitioner was apparently hiding. Officer Taylor spotted Petitioner as he drove into the alley. Officer Taylor drew his service revolver and ordered Petitioner to stop and remain still. Petitioner initially complied with Officer Taylor's order but then began walking away. Officer Taylor followed Petitioner and reached out to place his hand on him. Petitioner quickly turned around and grabbed Officer Taylor's gun. A struggle ensued, during which Petitioner obtained partial control of Officer Taylor's gun. Petitioner attempted to make Officer Taylor shoot himself by applying pressure to Taylor's finger which was still on the trigger. Ultimately, Officer Taylor regained control of the gun and shot Petitioner in the face.

Petitioner was rushed to the hospital where a CT scan revealed an air pocket in the front part of his brain and cerebral spinal fluid leaking from his nose and ear. Petitioner remained in the hospital approximately two months for treatment for injuries to his face, left eye, and brain. As a result of the gunshot wound, Petitioner lost his left eye and suffered permanent brain damage.

(R. Vol. 1, Doc. No. 35, pp. 2-3) (record citations omitted).[2] We will reference additional record facts as the discussion requires.

Allen was charged with first degree murder by way of Information filed November 24, 1986. The record of his arraignment on January 21, 1987, when he was not represented by counsel, reflects he was provided a copy of the Information. Shortly before his scheduled preliminary hearing, Allen's court-appointed attorney moved the state district court for a competency hearing, pursuant to which the court on January 27, 1987, remanded Allen to the Eastern State Hospital for evaluation. The Oklahoma Court of Criminal Appeals (OCCA), in deciding one of Allen's later appeals, succinctly summed up the Oklahoma competency procedures in place when Allen was remanded for evaluation:

> In the pre-trial context, the question of competency may be raised by the prosecutor, the defendant, defense counsel, or by the court *sua sponte*. Upon the filing of an application for determination of competency, the court holds a hearing to examine the application and determine if sufficient facts are alleged to create a doubt as to the competency of the defendant. If the court finds a doubt as to the competency of the defendant at this hearing, the defendant is ordered to undergo an examination by doctors or appropriate technicians.
>
> The examiner is ordered by the court to make the following determinations: 1) is this person able to appreciate the nature of the charges against him; 2) is this person able to consult with his lawyer and rationally assist in the preparation of his defense; 3) if the answer to question 1 or 2 is no, can the person attain competency

---

[2]The facts recited in the district court opinion differ slightly from those recited in the decision of Allen's second direct appeal. *Allen v. Oklahoma,* 923 P.2d 613, 616 (1996) (*Allen II*). The discrepancy relates to the location of the parties when the second of four shots was fired. It is immaterial to the disposition of this appeal.

within a reasonable time if provided with a course of treatment, therapy or training; 4) is the person a mentally ill person or a person requiring treatment as defined by statute; and 5) if the person were released without treatment, therapy or training would he probably pose a significant threat to the life or safety of himself or others.

After these determinations have been made, a post-examination competency hearing is held. Evidence regarding competence to stand trial is presented, and the judge, or jury if requested by the defendant, decides whether the defendant is competent to stand trial.

*Allen v. Oklahoma,* 956 P.2d 918, 919 (Okla. Crim. App. 1998), *cert. denied,* 525 U.S. 985 (1998) (citations and quotations omitted) (*Allen III*).

Within days of Allen's commitment, Dr. Samuel J. Sherman, a clinical psychologist at Eastern State Hospital, notified the court that while Allen was able to appreciate the nature of the charges against him, he was not presently able to consult with his lawyer and rationally assist in the preparation of his defense. He added that Allen could attain competency within a reasonable time with appropriate treatment. The court conducted a post-examination competency hearing and concluded Allen was incompetent but capable of achieving competence. To that end, Allen was remanded to Eastern State Hospital for further treatment. About four months later, on June 12, 1987, Dr. Allen Kirk, a psychiatrist at Eastern State Hospital, advised the court that Allen had achieved competency: he was able to appreciate the nature of the charges against him, consult with his attorney, and rationally assist his attorney in his defense. Dr. Kirk noted that Allen "has been stable on decreasing doses of antipsychotic medication, and currently is on no antipsychotic medication." Also, Allen was "not experiencing any significant psychiatric symptomatology." (R. Vol. 4,

Original R. (C-88-37) at 26-27.)  He added Allen was scheduled for surgery, including plastic surgery, necessitated by the gunshot wound to his head.  Upon receiving Dr. Kirk's report, the court set the matter for competency trial before a jury.  Another arraignment took place on August 7.  This time, Allen was represented by counsel.  The record shows he was then in receipt of a copy of the Information.

Prior to the competency trial (which was held October 19 and 20, 1987) Allen requested appointment of "mental health experts, psychologists, and psychiatrists . . . and neuropsychologists to the extent that Mr. Allen . . . has brain damage and . . . to determine the extent of his brain damage for purposes of present competency" acting under *Ake v. Oklahoma,* 470 U.S. 68, 83 (1985).  (R. Vol. 3, Tr. Competency Hr'g at 7.)  At Allen's request, the court appointed Dr. Edith King, clinical psychologist, to examine him.  Pursuant to the recommendation of his neurosurgeon, Dr. Stephen Cagle, Allen went back to the court and requested appointment of a neuropsychologist to examine him in order to ascertain if his brain injury affected his competency.  The court denied the request.  At the competency trial, Allen again moved for appointment of a neuropsychologist.  The court reserved ruling until conclusion of the other expert testimony.

A.    **Competency Trial**

Because all issues raised on appeal revolve around Allen's competency, we provide the following background material in significant detail.  At the competency trial, Dr. Cagle, after first cautioning as to use of the term "brain

-6-

injury" and its connotation, testified Allen suffered some structural brain injury as a result of the gunshot wound.[3] When asked whether he could offer an opinion as to the extent Allen's brain injury affected his competence, if at all, Dr. Cagle testified he could not.[4] He recommended a psychiatrist or psychologist, together with a neuropsychologist, to make that judgment. A neuropsychologist could evaluate "[h]igher injury to the brain affecting the more sophisticated thinking, emotional processes of the brain." (*Id.* at 23.)

Dr. Sherman, who first evaluated Allen after his initial commitment and evaluated him again shortly before Dr. Kirk declared Allen competent, agreed with Dr. Cagle's recommendation for a neuropsychologist to test the effect of the brain injury on competence, specifically to test whether Allen had sufficient

---

[3]Dr. Cagle went into some detail about Allen's brain injury:

> Mr. Allen, through this, from the first time I saw him until the last time, remained remarkably stable in terms of vital signs. He was always awake. He was conversing. He could move everything. From a neurological viewpoint his injury included loss of left eye and vision, loss of control of the muscle function of the left side of the face, loss of hearing in the left ear, all of that due to peripheral comminution of the bone and the nerves that run through the bone, getting to the ear, the eye. And he had some imbalance which again is due to the balance nerve which is in the ear compartment which was shattered by the bullet.

(R. Vol. 3, Tr. Competency Hr'g at 21-22.)

[4]Dr. Cagle testified Allen was cooperative with him. When asked about Allen's competency, however, he stated: "[c]ompetency is something frankly that we as neurosurgeons in this community do not make a lot of statements about. Competency reflects a higher intellectual functioning and certain psychiatric considerations that I wouldn't care to have an opinion on." (*Id.* at 26.)

memory of the events surrounding Titsworth's killing to assist his counsel.  On the other hand, he agreed with Dr. Kirk's report to the court that Allen was competent.  He added he detected no psychosis in Allen and agreed a person can suffer from brain injury and still be competent.

Dr. Kirk, who certified Allen's competency to the court as a lead-up to the competency trial, testified the only mental illness from which Allen suffered was long-term depression, with an associated history of substance abuse.[5]  This diagnosis did not bear on competency.  As he did in his report to the court, Dr. Kirk testified Allen was competent.  He added that Allen suffered some organic brain damage evidenced by an electroencephalogram and a neurological evaluation.  When asked whether an evaluation by a neuropsychologist would aid in a determination of competency, Dr. Kirk testified he did not believe it was necessary in Allen's case.  He conceded Allen suffered from some short-term and long-term memory loss.  However, the deficits were spotty.

Dr. Gregory McNamara, the jail physician who was seeing Allen twice a week, as he had for the previous six months, testified Allen communicated rationally with him, and he believed he was competent.  As he put it, "He has appeared and functioned as a man of average intelligence in all the time that I've seen him." (*Id.* at 103.)  Several other health providers testified Allen was able to communicate well with them.  Dr. David Simms, Allen's ear, nose and throat surgeon, testified he had rational conversations with Allen, including one in

_____

[5]The presentence investigation report indicated a long history of alcohol and drug abuse.

which Allen explained how he sustained his injury and did not claim to be without memory of the events surrounding his injury.

Apparently anticipating unfriendly testimony, Allen declined to call as a witness the one expert he had retained through his *Ake* request: Dr. Edith King. Instead, the State called Dr. King. She testified she interviewed Allen and administered a number of screening tests, including the Wechsler Adult Intelligence Scale for long-term memory and intelligence[6] and the Bender Gestalt Visual Motor Test for organic dysfunction. From the latter test, she detected "at least soft organic signs that there might be some visual motor problems." (*Id.* at 117.) These signs did not affect her opinion that Allen was competent to stand trial. Dr. King conceded neuropsychological testing, which required a specialist, would enable a deeper probe into the nature and extent of brain injury and, from that, further observations about legal competency. Nonetheless, she hewed to her opinion that under the standards enunciated in the Oklahoma statute, Allen was competent to stand trial. She indicated Allen had a reticence about discussing his case: "I feel he is able but doesn't want to reveal things about himself. I think he can if he will." (*Id.* at 119.)

---

[6]While his academic record is spotty, between 1977 and 1986 Allen completed twenty-eight hours of college instruction and earned a G.P.A. of 3.125. At his second sentencing hearing, Dr. Nelda Ferguson testified for Allen and stated he was a "bright man" of "high intelligence." (R. Vol. 3, Tr. Re-Sentencing Hr'g, Vol. II at 95.) He tested in 1993 with a verbal I.Q. of 117, in the bright range, and a performance I.Q. of 104, resulting in a full scale I.Q. of 111, also in the bright range. Six years later, Dr. Michael Gelbort tested Allen again, at which time he scored a verbal I.Q. of 79, a performance I.Q. of 73 and a full scale I.Q. of 75.

The only witness to testify to Allen's incompetence was one of his trial attorneys, Mr. Opio Toure. Although he conceded Allen understood the charges, it was Toure's belief Allen could not assist counsel in preparation of a defense. "I do believe he knows the charges and he understands the charges but he has not been able to assist me in the preparation of his defense as I've been talking with him." *Id.* at 68. According to Toure, the gist of the problem was that:

> [A]s I tried to get to talk to [Allen] about the charge, about the evidence, about our defense, I was not able to get through the entire conversation with him or just nearly an entire sentence without him interrupting me to the extent that up to this point the conversations that I've had with Mr. Allen had been incomplete in terms of me being able to discuss the trial with him, discuss his options with him, discuss the procedures and to give him advice.

*(Id.* at 67.)

At the conclusion of the evidence, the court revisited and denied Allen's request for appointment of a neuropsychologist.[7] The jury was instructed that Allen was presumed competent and he bore the burden to establish his incompetency by clear and convincing evidence. The jury found Allen did not meet his burden of proof, thus finding him competent to stand trial.

**B.    Plea of Guilty**

Less than a month later, on November 10, 1987, Allen changed tack and

_____

[7]As the court put it: "[a]fter hearing all the testimony in the case and all of the doctors and all the witnesses for both sides why, it's my opinion that there's no need in any way, shape or form to appoint any new medical witnesses to assist the defense in this case." (R. Vol. 3, Tr. Competency Hr'g at 144.)

entered a blind plea of guilty.[8]   In preparing to take the plea, the court inquired

of Allen, "[h]ave you ever been treated by a doctor or confined in a hospital for

mental illness?"  (R. Vol. 3, Tr. Change-of-Plea at 3.)  Allen answered in the

negative.  This colloquy between the court and trial counsel followed and

constitutes the sum of the discussion of the prior competency determination:

> MS. BAUMANN:  Judge, he was sent to Eastern State Hospital and spent about 4 months there.  He was there for evaluation and treatment, after November of '86, and he was returned as competent.
>
> Q.  That was not just for competency determination, but for actual treatment?
>
> MS. BAUMANN:  I believe he was given medication while he was there and the determination at the very beginning was that he was not competent, and then some 4 months later he was in fact returned as competent.  We did have a competency trial last month before Judge Cannon, and at that time the jury returned a verdict of competent as well.
>
> Q.  The jury determined him to be competent?
>
> MS. BAUMANN:  Yes, sir.

(*Id.* at 3-4.)

Critical to our review, the court then inquired of Baumann, who also

represented Allen at the competency trial, "do you have any reason to believe that

---

[8]Defined as "[a] guilty plea made without the promise of a concession from either the judge or the prosecutor."  Black's Law Dictionary 1171 (7th ed. 1999).

Mr. Allen is not mentally competent to appreciate and understand the nature, purposes and consequences of this proceeding?" (*Id.* at 4.) To this question, Baumann responded in the negative and assured the court that Allen had assisted her in presenting any available defense to the charge.

Allen assured the court he had reviewed with counsel the charges and possible penalties. The court then engaged in the familiar plea colloquy with Allen, who told the court he understood all of his enumerated rights and had reviewed them with counsel. Contemporaneous with his plea, Allen filed a document with the court entitled "Plea of Guilty Without Sentencing - Summary of Facts" in which he certified in writing he understood the charges, the penalties and the rights he was giving up in pleading guilty. He also certified he had discussed the charges with counsel; counsel, in turn, certified her client was competent, and she countersigned the document. (R. Vol. 4, Original R. (C-88-37) at 232-33.)

In aid of establishing a factual basis for the plea, Allen submitted an affidavit in his own hand in which he stated the facts of the crime. He wrote simply: "I shot & killed Gail Titsworth. I had no justifiable cause." (*Id.* at 234.) The court confirmed in colloquy with Allen that this was a true and correct statement. Baumann helped him prepare it. There is little disagreement that Allen had incomplete recollection of the killing; his admission was essentially based on acceptance of witness and police reports.[9] After its inquiry of Allen,

_____

[9]His trial counsel, Eugenia Baumann, testified at the federal evidentiary hearing: "His recollection [of the killing] was very sketchy due to the gunshot

-12-

including eliciting assurances from him that his judgment was good, he understood what he was doing and he was acting voluntarily, the court found him competent, found the plea to be knowingly and voluntarily entered and accepted the plea.

## C.    Sentencing

At sentencing, in answer to questions from his counsel, Allen explained his decision to plead guilty and his reticence to discuss the particulars of his case:

> Q.    What happened that caused you to think that there might be a problem?  Did something happen on a Monday, Tuesday or Wednesday or Thursday?
>
> A.    I really don't want – I don't want to talk about what problems we were having.
>
> Q.    I know that.
>
> A.    There is just so many things I wanted to avoid by pleading guilty.
>
> Q.    Like what?
>
> A.    Well, like for example just discussing what I did. I did not want my family involved in this and I honestly thought when I pleaded guilty that that would be the end of this.  That a sentence would be passed.  That was the impression that I got.  I had already taken my family through enough.  I had already taken her family through enough and I

---

wound to his head.  We had many conversations.  There were some things prior to that time and after that time he remembered and during the time it was all very sketchy." (R. Vol. 2 at 11.)  "Neither of us had any belief that he hadn't done substantially what [Allen's factual basis affidavit submitted to the court at plea hearing] says." (*Id.* at 13.)

had no desire to take them through more by going to trial and I had no idea that things were going to come down to this where my family would be called on the stand and her family would be called up on the stand and everybody just has to go through more stuff. I just thought you know, that if I committed the crime and admitted committing the crime that that would end it for everybody because to stretch things out does nobody any good. It does nobody any more good. I just don't see it as doing any one any good. I just don't see it. I don't see anything constructive about discussing problems we were having. I just don't see it. What motivated us to go to church, I just fail to see any reason for even being asked that.

Q.    In fact have you and I had some discussions about that, pretty heated discussions where - -

A.    As a matter of fact I asked you not to have my family up here. I knew I couldn't do anything about her family. I was hoping that they wouldn't have to appear either, because this just stretches things out. I have already put people through stuff and I did not want to put them through any more. Why we have to keep on going over why I did what I did you know, and my family has to tell what kind of person I was, and her family has to tell what kind of person she was, and I just can't see putting either family or anyone through that and I see kids getting up there and crying and I see my ex wife getting up there crying and my mother – and it just doesn't make any sense. I thought I could avoid all of this by just entering a plea of guilty. *I had no desire, I never had any desire to go to trial. I made every effort at a much earlier date than this to enter a plea of guilty.* Just to bring things to an end, and it might kind of make people have wrong ideas about things by my family being called up there, it is

-14-

like they are trying to cover for me or something like that, you know? But it is not that way at all. I don't want it to be misconstrued. I did not want them to get on the stand. I did not want them to go through any more. It wasn't just my family. I just don't see any point in hurting anybody any more. I just don't see that. I have told you that and I asked my relatives not to come. I couldn't tell my relatives anything, but when I first entered that plea I didn't think anybody was going to have to go through anything. *I can't see making a bad matter worse – bringing up the problems we were having and what motivated me to do what I did. It just makes things worse than ever.*

\*\*\*

Q.   Just one more question for you Garry. How do you feel about what you have done, how do you feel about how this has affected the lives of your family and those of Gail's?

A.   To her family it did a whole lot more damage to them than my family. And that's another reason I didn't want any of this to happen here in Court, because it just makes what's already a troubled situation worse and I pointed that out to you time and time again and I wanted to avoid things like this. I told you time and time again. I asked my family not to come because they weren't required to come unless they were subpoenaed and I just didn't want to put people through this. I just didn't want to do that. Man, the people might look at my family and they might associate that my family has been in some way responsible for what happened but it was solely my actions. It was something that I did and I don't want people to have misconceptions about my family, you know. Because I have a pretty good family and Gail's family was a pretty good family. They were always nice to me and like when her little kid – I mean when the boy got up on the stand yesterday and he

-15-

started crying that just kind of set it up for the whole thing, you know, and I just – people are just going through things that are not necessary for them to go through. I told you things like that and then I told you that before this day came up and I told you while this day was going on, this day and yesterday. *It just didn't seem to me to be necessary to be dragging other people in because I am the one responsible for this crime.*

(R. Vol. 3, Tr. Sentencing Hr'g at 298-300, 303-04) (emphasis added).)

After he was sentenced to death, Allen moved to withdraw his guilty plea on the grounds there was insufficient evidence to support imposition of the death penalty. The court denied the motion. Allen appealed, arguing the plea was invalid because the trial court did not adequately inquire into his competency to enter it, he did not understand the elements of the charged offense and there was no factual basis to support the plea. Although the OCCA affirmed the trial court's denial of the motion to withdraw the plea, it remanded the case for resentencing to enable the trial court to consider the newly-available sentencing option of life without parole. *Allen v. Oklahoma,* 821 P.2d 371, 375 (Okla. Crim. App. 1991) (*Allen I*).

## D. Resentencing

At resentencing, Allen suggested another reason for his inability to remember the events surrounding his murder of Titsworth, his practice of regularly intoxicating himself:

Q. Now, before this event, before November the 21st of 1986, how often did you drink; alcoholic beverages I'm talking about?

A. How often did I drink?

-16-

Q. Uh-huh.

A. I drank just about as often as I could.

Q. How much could you drink?

A. I could drink as much as I could afford to get.

Q. Well, could you drink a fifth?

A. Easily, if I could afford to get it. I'd always find some kind of way. I could drink just as much as I could.

Q. How often would you get drunk, say in a week?

A. I'd get drunk as many days in the week as I could.

\*\*\*

Q. What's the last thing that you remember before that 5:00 p.m. on November the 21st of 1986?

A. I can remember drinking a lot and I don't even know if it was on that day, but I was drinking just about every day at that point.

(R. Vol. 3, Tr. Resentencing Hr'g, Vol. II at 175-76, 182.)[10]

The court resentenced Allen to death. Allen appealed on a number of grounds, none of them relevant to our review, and the OCCA again affirmed.

---

[10]Years later, in the federal evidentiary hearing, Baumann testified Allen was severely intoxicated at the time of the killing, and this contributed to his inability to remember the particulars of the event. Hospital records indicated his blood alcohol content around the time of admission for his gunshot wound was 0.27.

*Allen v. Oklahoma,* 923 P.2d 613 (Okla. Crim. App. 1996) (*Allen II*). The United

States Supreme Court granted *certiorari*, vacated the judgment and remanded to

the OCCA for further consideration in light of *Cooper v. Oklahoma,* 517 U.S. 348

(1996) (holding the Oklahoma requirement that defendant prove incompetence by

clear and convincing evidence, rather than by a preponderance of the evidence,

violates due process). *Allen v. Oklahoma,* 520 U.S. 1195 (1997).

On remand, the OCCA first recognized the general rule that "[a] criminal

defendant must be competent to go to trial or to enter a plea." *Allen v. Oklahoma,*

956 P.2d 918, 919 (Okla. Crim. App. 1998), *cert. denied,* 525 U.S. 985 (1998)

(*Allen III*). It pointed out that *Cooper* was not implicated because the flawed

burden of proof was applied in a competency trial in expectation that Allen would

proceed to trial if found competent. When Allen changed tack and decided to

plead guilty, the presiding judge in the trial court concluded afresh that Allen was

competent to enter his plea.

> In the plea context, the trial judge is charged in every case with the
> duty to determine whether the defendant is competent to enter the
> plea. This is accomplished by: 1) appropriate interrogation of the
> defendant, and defense counsel if the defendant is represented,
> regarding the defendant's past and present mental state; and 2)
> observation of the defendant's behavior before the court. If a
> substantial question as to the defendant's competency exists, the
> defendant shall be committed for a competency evaluation as
> provided in 22 O.S. 1991, § 1172.

*Id.* (quotation and citations omitted). After carefully reviewing the plea colloquy,

the OCCA concluded the prior competency determination by the jury did not taint

the fresh competency determination. "At the plea hearing the trial judge relied on

his personal interrogation of Allen, his personal interrogation of Allen's counsel, and his personal observation of Allen's demeanor. None of the evidence raised any doubt as to Allen's competence to enter a plea." *Id.* at 921. The OCCA placed special significance on the colloquy between Allen's counsel and the trial court:

> Three weeks earlier at the post-examination competency hearing, she had questioned co-counsel regarding Allen's ability to assist with his defense. The elicited testimony was the only evidence supporting the allegation Allen was not competent to stand trial. At the plea hearing, as an officer of the court, defense counsel told the presiding judge Allen had assisted her with his defense. Thus, the one issue which raised a question as to Allen's competence at the post-examination competency hearing, his ability to assist counsel with his defense, had been resolved. There was no longer any evidence to support a doubt as to Allen's competence.

*Id.* Based on the plea colloquy and the record as a whole, the OCCA determined Allen was competent to enter his plea. *Id.*

### E.    State Post-Conviction Relief

Allen applied to the OCCA for post-conviction relief, raising seven propositions of error. Material to this appeal are those alleging: 1) Allen was convicted while incompetent, and 2) ineffective assistance of trial counsel in permitting entry of a guilty plea when Allen was incompetent. In an unpublished decision, *Allen v. Oklahoma*, No. PC 97-311 (Okla. Crim. App. July 20, 1998) (*Allen IV*), the OCCA concluded the incompetence issue was procedurally barred because it had previously been raised and decided in *Allen III*, on remand from the Supreme Court. It concluded the ineffective assistance of trial counsel claim was waived because it could have been raised, and was not, on direct appeal.

-19-

Of particular interest during the post-conviction proceedings was an affidavit submitted by Dr. Michael M. Gelbort, a clinical psychologist, in which he recounted the results of a neuropsychological evaluation he conducted on Allen in February 1997. He indicated, "the patient has no recollection for the incident and this is as would be expected due to the neurotrauma he sustained." (Appellant Br., Attach. K at 5.) Based on his findings, he concluded "the patient is able to appear or 'present' more normally than he is actually able to function or perform as he has some of the basic skills present but lacks or is flawed on the higher level abilities." (*Id.* at 4.) He added:

> As a result of the brain damage and associated cognitive deficits or impaired thinking abilities, the patient is and has been unable to comprehend the meaning of the proceedings in which he is involved in post-conviction relief work and is unable to assist his attorney in any meaningful way. This impairment and his resulting inability to assist counsel is present now, would have been and was present since the time of his brain injury/gun shot wound, and, if it has changed since the time of the brain damage, would have improved rather than worsened. This is to say that the patient is equally or more able to assist counsel now as compared with the time of his original trial and that he is not able to assist counsel at this time.

(*Id.* at 6.) He was critical of the previous assessments of Allen by other examiners, including those involved in the competency trial nearly ten years earlier.

**F.    Federal Habeas Review**

Having failed to obtain relief through state post-conviction procedures, Allen filed his federal habeas petition under 28 U.S.C. § 2254 on August 3, 1999.

In it, he raised eight grounds for relief.  After a limited evidentiary hearing,[11] the

district court denied the petition in a Memorandum Opinion.  Five issues have

been certified for review, one has been abandoned, leaving four for our

consideration.  These are:  1) a procedural competency claim (including sub-

claims of a violation of *Ake v. Oklahoma,* 470 U.S. 68, 83 (1985), and ineffective

assistance of appellate counsel for failing to raise the *Ake* claim), 2) a substantive

competency claim, 3) an ineffective assistance of trial counsel claim based on

counsel permitting Allen to enter a plea of guilty despite his alleged

incompetency, and 4) a claim that Allen's plea was not knowing, voluntary and

intelligent.[12]

Our review begins with the testimony of Allen's trial counsel, Baumann, at

---

[11]Although the district court granted an evidentiary hearing on only one
ground for relief (ineffective assistance of trial counsel due to conflict of interest
in motion to withdraw guilty plea), it considered the evidence adduced at the
hearing in resolving all issues presented.

[12]Allen declines to argue on appeal a claim of ineffective assistance of
counsel due to a conflict of interest in the motion to withdraw plea, one of eight
grounds for relief presented in the habeas petition and one of the five issues the
district court certified for review.  We therefore consider this claim abandoned.
*State Farm Fire & Cas. Co. v. Mhoon,* 31 F.3d 979, 984 n.7 (10th Cir. 1994)
(citation omitted).  Allen requested us to expand the certificate to include three
additional issues: 1) a claim pursuant to *Ford v. Wainwright,* 477 U.S. 399, 410
(1986), that he not be executed because he is insane, 2) denial of an evidentiary
hearing on all but one of the grounds for relief presented in the habeas petition,
and 3) cumulative error.  Judge Porfilio, in his Case Management Order issued on
behalf of this Court, adopted the certificate of appealability issued by the district
court and declined to expand it as requested.  In spite of the limited certificate,
Allen argues the *Ford* claim and cumulative error claim we have already declined
to certify.  Not being certified, we do not consider them.  28 U.S.C. §
2253(c)(1)(A).  Only four issues are presented for our review.

the evidentiary hearing. Her testimony echoed statements she made in a 1997 affidavit provided in the state post-conviction proceeding and in a 1999 written declaration submitted in the federal habeas proceeding. She testified it was always her belief that Allen was incompetent to plead. In her view, Allen did not fully understand the possible sentence he could face in the event he pled guilty; nor did he understand the rights he was giving up by pleading guilty, including the right to a lesser-included offense instruction on manslaughter and a voluntary intoxication instruction. She failed to inform the trial judge of her belief in Allen's incompetency because a jury had found him competent and, in any event, it was Allen's wish to plead guilty.[13] She wanted to take the case to trial. She believed Allen had a viable defense of voluntary intoxication and an opportunity for an instruction on manslaughter as a lesser-included offense.

Notwithstanding her reversal on Allen's competence, Baumann averred numerous times in her testimony that her primary objective in filing an appeal was to undo the death penalty, not the conviction:

Q.   You wanted an appeal?

A.   Yes.

Q.   Because you needed to get out from underneath the death penalty, right? Your client did at least?

---

[13]As Baumann put it, "My opinion never changed. At that particular point in time, having had the jury trial where he was found mentally competent, I didn't believe it was my decision to tell this man he couldn't plead guilty." (R. Vol. 2 at 31.) "I felt it was in his best interest to go to trial. He did not want to go to trial. I felt like he had the right to make that decision because he was a legally competent man." (*Id.* at 34.)

-22-

A.     Yes.

Q.     You wanted to advance that goal, correct?

A.     Yes.  I never thought he should have gotten the death penalty
       in the first place.  He shouldn't have it now.

(R. Vol. 2 at 43.)  She later added:

Bottom line was I didn't think the man should have gotten the death
penalty and I wish that some court along the line would recognize
that fact and give the man some relief.  He shouldn't have gotten the
death penalty the first time, he shouldn't have gotten it the second
time.

(*Id.* at 57.)

## II.     *Standard of Review*

We defer to a state court's legal conclusions if it has previously addressed a

habeas claim on the merits.  Our deference is guided by the following:

An application for a writ of habeas corpus on behalf of a person in
custody pursuant to the judgment of a State court shall not be granted
with respect to any claim that was adjudicated on the merits in State
court proceedings unless the adjudication of the claim (1) resulted in
a decision that was contrary to, or involved an unreasonable
application of, clearly established Federal law, as determined by the
Supreme Court of the United States; or (2) resulted in a decision that
was based on an unreasonable determination of the facts in light of
the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  In so doing, we review the district court's legal analysis of

the state court decision de novo.  *Valdez v. Ward,* 219 F.3d 1222, 1230 (10th Cir.

2000), *cert. denied*, 532 U.S. 979 (2001).

We first inquire whether the federal law in question was clearly established.

If so, we turn to whether the state court decision was contrary to or involved an

-23-

unreasonable application of it. *Id.* at 1229.

> A federal habeas court may issue the writ under the 'contrary to' clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts. The court may grant relief under the 'unreasonable application' clause if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case. The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively unreasonable, and . . . an unreasonable application is different from an incorrect one.

*Bell v. Cone,* 535 U.S. 685, 694 (2002) (citations omitted).

If a state court has not previously heard a habeas claim on the merits, we review the district court's legal conclusions de novo and factual findings for clear error. *Mitchell v. Gibson,* 262 F.3d 1036, 1045 (10th Cir. 2001). If the district court's factual findings depend entirely on the state court record, we independently review that record. *Walker v. Gibson,* 228 F.3d 1217, 1225 (10th Cir. 2000), *cert. denied*, 533 U.S. 933 (2001). A state court factual finding is presumed correct. The applicant for a writ of habeas corpus has the burden of rebutting the presumption of correctness by clear and convincing evidence. 28 U.S.C. § 2254(e)(1).

### III.  Discussion

#### A.  Procedural Competence

We begin by noting that in support of his argument for procedural incompetence, Allen relies on deficiencies in the competency trial including: 1) the failure of the trial court to instruct the jury on the correct standard for

incompetency, *see Cooper,* 517 U.S. at 369, and 2) the failure of the trial court, after a timely defense request, to appoint a neuropsychologist to examine Allen in accord with *Ake*. Allen's focus on the competency trial is misplaced because he waived any objection to it when, several weeks after the jury found him competent, he changed tack by abandoning any claim of incompetence and entering a plea of guilty. *See United States v. Salazar,* 323 F.3d 852, 856 (10th Cir. 2003) (voluntary and unconditional guilty plea waives all non-jurisdictional defenses preceding plea; only voluntary and intelligent character of plea may thereafter be challenged). Therefore, the proper focus of our review is the plea proceeding. *See Allen I & Allen III.*

While we generally construe Allen's claim to be one of procedural incompetence, it includes sub-claims for violations of the Fourteenth and Sixth Amendments, premised on *Ake,* 470 U.S. 68, 83 (1985), which requires the state to assure a defendant access to a competent psychiatrist when sanity is at issue. We have interpreted *Ake* to apply to pre-trial competency proceedings. *Walker v. Oklahoma,* 167 F.3d 1339, 1348-49 (10th Cir.), *cert. denied,* 528 U.S. 987 (1999). It is important to distinguish Allen's claim and sub-claims because each requires its own standard of review.

### 1) *Ake Sub-Claims*

Each of the sub-claims is based on the refusal of the trial court to appoint a neuropsychologist to examine Allen in aid of his claim of incompetence to stand trial. In the first instance, Allen alleges that his Fourteenth Amendment right to due process was violated by the state trial court's failure to comply with *Ake*.

Secondly, he alleges appellate counsel was ineffective, in violation of the Sixth

Amendment, for failing to raise on direct appeal the trial court's refusal to

appoint a neuropsychologist as required by *Ake*.[14]  Allen first raised these sub-

claims in state post-conviction proceedings.  In that venue, he did not present the

alleged *Ake* violation as a stand-alone claim.  Rather, he presented it as evidence

supporting his ineffective assistance of appellate counsel claim.  Now presented

as a stand-alone claim in the federal habeas petition, it is vulnerable to the

argument it cannot be heard because it has not been exhausted in state

proceedings, 28 U.S.C. § 2254(b)(1)(A), or, in the alternative, because it is

procedurally barred.  *Harris v. Champion,* 48 F.3d 1127, 1131 n.3 (10th Cir.

1995).  Notwithstanding these concerns, the district court considered the *Ake*

claim on its merits, citing to § 2254(b) (subsection (b)(2) permits denial of a

claim on the merits even though it is not exhausted) and *Romero v. Furlong,* 215

F.3d 1107, 1111 (10th Cir.) (allowing review of claim on merits, in spite of

possibility of procedural bar, in interest of judicial economy), *cert. denied*, 531

U.S. 982 (2000).  For like reasons, we do the same.  As to the ineffective

assistance of appellate counsel claim, it has been inadequately briefed.  We will

therefore not consider it.  *Gross v. Burggraf,* 53 F.3d 1531, 1547 (10th Cir. 1995).

Also, since it is resolved by the merits of the independent *Ake* claim, there is no

---

[14]Allen also claims, without elaboration, that the refusal of the trial court to appoint a neuropsychologist amounts to state-induced ineffective assistance of counsel in violation of the Sixth Amendment.  We will not review this perfunctory, undeveloped claim.  *Murrell v. Shalala,* 43 F.3d 1388, 1389 n.2 (10th Cir. 1994).

need to consider it further. Inasmuch as the Oklahoma courts have not previously adjudicated the merits of the *Ake* claim, we review de novo. *Mitchell,* 262 F.3d at 1045.

Having settled on the plea proceeding as the focus of our review, we liberally construe Allen's *Ake* argument to be that failure to appoint a neuropsychologist in the competency trial tainted the trial court's finding of competence when Allen entered his plea. Because we conclude Allen was not entitled to appointment of a neuropsychologist at the competency trial, we need not reach the manner in which or the degree to which the alleged *Ake* violation tainted the competency determination at entry of the plea.

*Ake* stands for this proposition:

> When the defendant is able to make an *ex parte* threshold showing to the trial court that his sanity is likely to be a significant factor in his defense . . . the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

*Ake,* 470 U.S. at 82-83. As we noted earlier, its rule extends to pre-trial competency proceedings. *Walker,* 167 F.3d at 1348-49. Although we interpret *Ake* broadly, *id.* at 1348, "[g]eneral allegations supporting a request for court appointment of a psychiatric expert, without substantive supporting facts, and undeveloped assertions that psychiatric assistance would be beneficial to the defendant will not suffice to require the appointment of a psychiatrist to aid in the preparation of a criminal defense." *Liles v. Saffle,* 945 F.2d 333, 336 (10th Cir. 1991), *cert. denied*, 502 U.S. 1066 (1992). Even if we identify an *Ake* violation,

we disregard the error if it is harmless. *Walker,* 167 F.3d at 1348.

The record reveals the trial court granted Allen's *Ake* request for appointment of an expert to inquire into his competency to stand trial. Therefore, we are not presented with a claim that the trial court failed altogether to make an *Ake* appointment. Instead, we are presented with a claim that additional expert appointment was required to complete the evaluation of Allen's competence, and the additional appointment was unconstitutionally denied. We construe Allen's claim to be that the failure to make the additional appointment rendered the appointment of Dr. King, standing on its own, noncompliant with *Ake.*

We previously addressed this very issue in *Walker*. There, a defense psychiatrist testified to Walker's insanity at the time of commission of the crime. In preparation for trial, he urged that Walker be subjected to neurological testing to flesh out the etiology of his mental illness. To this end, Walker was examined by a neurologist to test for the presence of minimal brain damage. The neurologist suggested re-administration of an electroencephalogram to rule out seizure disorder and a CT scan to evaluate for physical brain abnormalities. "[D]ue either to lack of time or lack of funds, Mr. Walker was denied the opportunity to conduct the additional neurological testing recommended by the experts who examined him before trial." *Walker,* 167 F.3d at 1348. We concluded the failure to provide the additional neurological testing violated *Ake*, although we also concluded the error was harmless. *Id.* at 1348-49.

We distinguish the facts presented in *Walker* from those presented here. In Allen's case every witness who testified to his competence, including Allen's own

*Ake* expert, Dr. King, testified he was competent. None qualified his or her opinion, as did the psychiatrist in *Walker*, with a recommendation for further testing. Although Dr. Sherman, who first examined Allen and examined him again after Dr. Kirk found him to be competent, testified that he agreed with Dr. Cagle (the neurosurgeon who did not offer an opinion on competency) that consultation with a neuropsychologist might illuminate the degree to which Allen's brain injury affected his memory of the events surrounding the killing, he nonetheless agreed with Dr. Kirk that Allen was competent. He also agreed a person can suffer brain injury and still be competent. The psychiatrist, Dr. Kirk, testified Allen was competent. While he acknowledged that Allen suffered some organic brain damage evidenced by an electroencephalogram and a neurological evaluation, and conceded some loss of both short and long-term memory, in his opinion further evaluation by a neuropsychologist was not necessary to a determination of competency. While Dr. King, like Dr. Kirk, conceded some brain damage, it was her opinion that neuropsychological testing, while it would enable further investigation into the nature and extent of the brain injury, was unnecessary to reach a conclusion about legal competence. In view of this series of expert opinions of competency, none of them qualified by recommendation for further testing, refusal of the trial court to appoint a neuropsychologist for Allen did not implicate *Ake*.

We are bolstered in our conclusion by Dr. King's testimony about Allen's reticence to discuss details of the killing. It is significant because it parallels Allen's own testimony about speaking of the crime and offers a non-

neuropsychological explanation for his reserve. Recall Dr. King's observation, "I feel he is able but doesn't want to reveal things about himself. I think he can if he will." (R. Vol. 3, Tr. Competency Hr'g at 119.) The only witness at the competency hearing to testify that Allen was not competent was one of his attorneys, Toure. In his opinion, although Allen understood the charges, he was not able to assist his legal team in preparing a defense. To a large degree, Toure based his opinion of incompetence on Allen's inability or unwillingness to communicate with his defense team about the crime. At sentencing, Allen explained his reticence was due to his unhappiness at having to discuss the particulars of the crime. He wanted to spare his family and the victim's family from re-living the event. As he put it, "I can't see making a bad matter worse – bringing up the problems we were having and what motivated me to do what I did. It just makes things worse than ever." (R. Vol. 3, Tr. Sentencing Hr'g at 300.) At resentencing, Allen offered an alternative explanation for his lack of recall. He revealed that in the days leading up to the day of the crime, and possibly even on the day of the crime itself, he was drinking to the point of intoxication. "I'd get drunk as many days in the week as I could." (R. Vol. 3, Tr. Re-Sentencing Hr'g, Vol. II at 176.)[15] To be sure, the gunshot wound he sustained likely impaired his memory of events. Nonetheless, the record leads to the inescapable conclusion that at least some of what appeared to examiners and his own attorney to be memory loss, capable of more exact determination through a neuropsychological exam, was actually an unwillingness to discuss the crime or

---

[15]*See* n.10.

a memory obscured by the effects of alcohol. In any event, there is no dispute as to the facts surrounding the killing, notwithstanding Allen may not recall all of them. Under these circumstances, impaired memory does not implicate due process. *United States v. Borum,* 464 F.2d 896, 900 (10th Cir. 1972).

In support of his claim of an *Ake* violation, Allen offers the affidavit of Dr. Gelbort from the state post-conviction proceeding, given nearly ten years after the competency hearing and nearly eleven years after Allen killed Titsworth. Dr. Gelbort is a clinical psychologist. He administered a neuropsychological evaluation to Allen. He attributed Allen's inability to recall events surrounding the killing to the neurotrauma he sustained when he was shot. He concluded Allen's apparent ability to communicate masked an inability to function at a higher intellectual level. In his opinion, Allen was incompetent at the time of his competency hearing.

The district court considered Dr. Gelbort's dated (1997) evaluation and concluded that it is not sufficiently persuasive to tip the balance in favor of an *Ake* violation when viewed alongside the testimony of several experts (including a psychiatrist and two clinical psychologists) who examined Allen within a year of the killing.[16] While correct in its conclusion, the district court was overly charitable in even considering and evaluating the Gelbort material on this issue. The results of a 1997 examination do not inform a debate about the propriety of a

---

[16]We also note a number of Allen's other, non-mental health care providers testified consistently as to his ability to rationally communicate with them on a regular basis.

1987 decision relating to the need for a fourth mental health expert (neuropsychologist) to explore peripheral issues; that decision is tested by reference to contemporaneous materials, not post hoc opinions. Allen failed to make the "*ex parte* threshold showing," necessary to require appointment of a neuropsychologist. *Ake,* 470 U.S. at 82.

### 2) *Procedural Competence Claim*

Having settled the *Ake* question, we turn to the broader question of procedural competency. It was raised initially in *Allen I*. There, the issue was framed as whether the trial court had sufficiently inquired into Allen's competence to enter a plea. *Allen,* 821 P.2d at 373. The OCCA found that it had. *Id.* The issue was not raised again in *Allen II*, the decision affirming Allen's resentencing. We only mention *Allen II* because when the Supreme Court granted *certiorari*, it did so not for the purpose of further reviewing the resentencing, but rather, for the purpose of vacating the judgment itself and remanding the case to the OCCA "for further consideration in light of *Cooper v. Oklahoma.*" *Allen v. Oklahoma,* 520 U.S. 1195 (1997) (citations omitted). As we have mentioned, *Cooper* concerned the standard of proof to be applied in a pre-trial competency determination. *Cooper,* 517 U.S. at 369. In *Allen III*, the OCCA conducted the review ordered by the Supreme Court and found *Cooper* to be inapposite where a defendant did not stand trial, but instead entered a plea of guilty. *Allen,* 956 P.2d at 920. It then reviewed the trial court's pre-plea competency determination for Allen and found it to be without error. It also concluded the prior competency trial conducted with an unconstitutional burden of proof did not taint the court's

fresh determination of competency for purposes of entry of the plea. It reinstated its original competency decision in *Allen I* (together with the resentencing decision in *Allen II*). *Id.* at 921. The Supreme Court allowed these decisions to stand. *Allen v. Oklahoma,* 525 U.S. 985 (1998). In sum, because the OCCA, in *Allen I* and *Allen III*, adjudicated on the merits Allen's claim of incompetency when he entered his plea, we review its decisions with the deference required by 28 U.S.C. § 2254(d).

We first note there is no record evidence to support the argument that the judge who took Allen's guilty plea was influenced or otherwise tainted in his determination of competency by the earlier jury verdict of competency (irrespective of whether an additional *Ake* expert was appointed). The judge at the plea proceeding was not the same judge who conducted the competency trial; in fact, he did not preside over any of the pre-trial competency proceedings. The record is silent as to whether he was familiar with them at all prior to the plea proceeding. We do know from his questioning of Allen and his colloquy with trial counsel that it appears he was being informed for the first time, just prior to taking Allen's plea, of the course of the earlier competency proceedings. We also know he engaged in his own fresh inquiry as to Allen's competence to enter a plea. This record does not even suggest taint.

The law of competency is well-settled. "[T]he criminal trial of an incompetent defendant violates due process. This prohibition is fundamental to an adversary system of justice." *McGregor v. Gibson,* 248 F.3d 946, 951 (10th Cir. 2001) (quotations and citation omitted). The test for determining competency

to stand trial is this: "[t]he trier of fact must consider 'whether [defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding--and whether he has a rational as well as factual understanding of the proceedings against him.'" *Id.* at 952 (quoting *Dusky v. United States,* 362 U.S. 402 (1960)). The standard of competence to enter a guilty plea is identical. *Godinez v. Moran,* 509 U.S. 389, 399 (1993).

Competency claims may be based on violations of both procedural and substantive due process. "A procedural competency claim is based upon a trial court's alleged failure to hold a competency hearing, or an adequate competency hearing, while a substantive competency claim is founded on the allegation that an individual was tried and convicted while, in fact, incompetent." *McGregor,* 248 F.3d at 952. The standards of proof for procedural and substantive competency claims differ. To make out a procedural competency claim, a defendant "must raise a bona fide doubt regarding his competency to stand trial . . . ." *Id.* This requires a demonstration that "a reasonable judge should have doubted" the defendant's competency. *Id.* at 954. It does not require proof of actual incompetency. *Id.* A substantive competency claim, on the other hand, requires the higher standard of proof of incompetency by a preponderance of the evidence. *Cooper,* 517 U.S. at 368-69; *Walker,* 167 F.3d at 1344.

In evaluating a procedural competency claim, we look only at the evidence available to the trial court when the plea was entered to determine if the judge ignored evidence that objectively would have raised doubt about the defendant's fitness to proceed. *Walker*, 228 F.3d at 1227; *see also McGregor*, 248 F.3d at 954

-34-

("[E]vidence of . . . irrational behavior . . . demeanor . . . and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." (quotation omitted)).  Defense counsel is often in the best position to evaluate a client's competence.  *Bryson v. Ward,* 187 F.3d 1193, 1201 (10th Cir. 1999), *cert. denied*, 529 U.S. 1058 (2000).  "[A]ssessment of a procedural competency claim requires us to form a judgment on the aggregate not the segment.  We examine the totality of the circumstances:  all evidence should be considered together, no single factor stands alone."  *McGregor,* 248 F.3d at 955 (quotation and alteration omitted).  "The question is   . . . whether the trial court failed to give proper weight to the information suggesting incompetence which came to light . . . ."  *Id.* (quotation omitted).

With these principles in mind, we examine the record.  As we have already explained in discussing the *Ake* claim, all of the expert testimony at the competency trial, including that adduced from Allen's own *Ake* expert, was that Allen was competent to stand trial.  Moreover, during the plea proceeding, Allen exhibited no irrational behavior.  To the contrary, he appeared cogent and rational in colloquy with the court.  He assured the court he had reviewed with counsel the charges and possible penalties, and he gave every indication he understood the rights the court explained to him and the fact he would waive those rights in pleading guilty.  He added he had discussed his rights with counsel.  As further indication of his understanding of the proceedings, Allen filed a document with the court entitled "Plea of Guilty Without Sentencing - Summary of Facts" in which he again certified he understood the charges, the penalties and the rights he

-35-

was giving up by pleading guilty, and that he had discussed the charges with counsel. (R. Vol. 4, Original R. (C-88-37) at 232-33.) Allen continued to demonstrate an equally rational demeanor at sentencing, which is reflective to some degree of his mental condition at the time he pled guilty.

Although one of Allen's attorneys, Toure, testified at the competency trial that his client was not competent, we discount his testimony for the same reasons given in our *Ake* discussion. An additional and compelling reason to disregard his testimony is that at the plea proceeding, only three weeks after Toure's testimony, Allen's remaining attorney, Baumann, assured the court that Allen appreciated the nature, purposes and consequences of the proceeding and had assisted her in presenting any available defense. The trial court properly relied on Baumann's representation as to the competency of her client. *See Bryson*, 187 F.3d at 1201.

Based on the totality of the evidence, we conclude Allen has not demonstrated the trial court ought to have entertained a bona fide doubt as to his competency to enter a plea. This being so, we find no error in the state court determinations in *Allen I* and *Allen III*, especially when we accord those determinations the deference required by § 2254(d).

## B. Substantive Competence

We construe *Allen I* and *Allen III* to dispose of Allen's substantive competency claims as well as procedural ones. Therefore, we again review with § 2254(d) deference.

"[T]o succeed in stating a substantive incompetency claim, a petitioner must present evidence that creates a real, substantial and legitimate doubt as to

-36-

his competency to stand trial." *Walker,* 167 F.3d at 1347 (quotations omitted). At the plea proceeding there was insufficient evidence to justify even a hearing on incompetency. *A fortiori*, there was insufficient evidence to support a claim of substantive incompetency. *Id.*

Allen is not aided by Dr. Gelbort's affidavit or Baumann's testimony. As we earlier noted, Dr. Gelbort's observations are insufficient to undermine the accumulated contemporaneous testimony of competency adduced at the competency trial. As to Baumann, in her 1997 affidavit (submitted in support of Allen's state post-conviction petition), her 1999 declaration and her 2001 testimony (both submitted in support of federal habeas relief), she disavows her assurance of Allen's competence given to the trial court when the guilty plea was accepted and solemnly declares him to have been incompetent at the time. Her about-face on the competency issue strongly suggests a willingness to "fall on the sword" in order to derail a death sentence. The motive is transparent, if not misguided.

## C. Invalid Guilty Plea

"In addition to determining that a defendant who seeks to plead guilty . . . is competent, a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." *Godinez,* 509 U.S. at 400. The competency inquiry focuses on a defendant's ability to understand the proceedings; the "knowing and voluntary" inquiry focuses on whether he in fact did understand the proceedings. *Id.* at 401 n.12. "[A] plea of guilty cannot be voluntary in the sense that it constitutes an intelligent admission that the accused committed the offense

unless the accused has received real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process." *Marshall v. Lonberger,* 459 U.S. 422, 436 (1983) (quotation omitted).  Allen claims he was not informed of the intent element (malice aforethought) of the crime with which he was charged and to which he pled guilty, and as a consequence his plea was not knowing and voluntary.  He previously raised this issue in *Allen I*, and the state court denied relief.  Therefore, we review with § 2254(d) deference.

Allen relies on *Henderson v. Morgan,* 426 U.S. 637 (1976), a case in which the Supreme Court vacated a conviction on the grounds the plea of guilty was not knowing and voluntary because there was no evidence the defendant understood the intent element of the crime with which he was charged.  The defendant had been charged with first degree murder and was informed in open court as to this charge, including its intent element of having "willfully" committed the act.  *Id.* at 642.  He pled guilty to second degree murder without a formal substitute charge having been filed.  The intent element for second degree murder was an "intent to cause . . . death."  *Id.* at 643.  In federal habeas, the district court found that neither counsel nor the trial court informed the defendant of the intent element of second degree murder before he pled to the charge.[17]  *Id.* at 640.  The narrowness

_____

[17]The Court drew a fine but significant distinction between whether a factual basis supports the presence of the requisite intent and whether a defendant understands that the requisite intent is an element of the crime.  A demonstration of the former does not satisfy the requirement of the latter.  *Henderson,* 426 U.S. at 645-46.  We have exhaustively reviewed the record of Allen's case, and conclude it establishes a factual basis for the charge of first degree murder,

of the Court's holding is evidenced by this passage in its opinion:

> Normally the record contains either an explanation of the charge by the trial judge, or at least a representation by defense counsel that the nature of the offense has been explained to the accused. Moreover, even without such an express representation, it may be appropriate to presume that in most cases defense counsel routinely explain the nature of the offense in sufficient detail to give the accused notice of what he is being asked to admit. This case is unique because the trial judge found as a fact that the element of intent was not explained to respondent.

*Id.* at 647.

In order to establish an involuntary plea under *Henderson*, we require a petitioner to: "(1) show that the [intent] element was a critical element of [the charge]; (2) overcome the presumption that his attorney explained this element to him at some other time prior to his guilty plea; and (3) demonstrate that, prior to his guilty plea, he did not receive notice of this element from any other source." *Miller v. Champion,* 161 F.3d 1249, 1255 (10th Cir. 1998); *Henderson* at 647. As to the second requirement, we will not indulge the presumption unless there is factual basis in the record to support it. *Id.*

"Malice aforethought" is defined in both the murder statute under which Allen was charged and in an Oklahoma pattern jury instruction. The statute provides, in pertinent part: "Malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof." OKLA. STAT. TIT. 21, § 701.7A.

---

including its intent element. This conclusion alone, however, does not settle the question whether Allen had notice of the intent element and understood it.

Malice aforethought means a deliberate intention to take away the life of a human being. As used in these instructions, malice aforethought does not mean hatred, spite or ill-will. The deliberate intent to take a human life must be formed before the act and must exist at the time a homicidal act is committed. No particular length of time is required for formation of this deliberate intent. The intent may have been formed instantly before commission of the act. OUJI-CR (2d) 4-62.

*Williams v. Oklahoma,* 22 P.3d 702, 714 (Okla. Crim. App. 2001) (quotations omitted). Put simply, malice aforethought denotes a deliberate killing where the intent to kill may be formed right up to the commission of the act. This is not a difficult concept for the ordinary person to grasp, particularly when assisted by legal counsel. It admits of no subtlety. The question presented is whether Allen understood both the meaning of the term and that it was an element of the crime to which he pled guilty. To answer this question, we look to the record.

As to *Miller's* first requirement, we do not gainsay that the intent element of a criminal offense is a critical element of the charge. *See Miller,* 161 F.3d at 1255. As to *Miller's* second requirement,[18] whether Allen has overcome the presumption that his trial counsel explained to him the intent element of malice aforethought, we first point out that Allen was charged by way of Information

---

[18]For purposes of its analysis, the district court assumed, without finding, that Allen's counsel failed to advise him of the intent element of the charge. (R. Vol. 1, Doc. 35 at 46.) It resolved the *Miller* test against Allen on the basis of the third requirement of the test. It concluded Allen had acquired notice of the intent element from sources other than his attorney. (*Id.* at 50-51.) We do not indulge this assumption. *See* n. 22.

reciting the offense and its included intent element.[19] Conceding our focus in evaluating the validity of the plea is on whether Allen did in fact understand the charge and not on whether he was capable of understanding it, the fact that all of the mental health experts who testified at the competency hearing testified that he was capable of understanding the charge lays a necessary predicate for a finding he did in fact understand it. At the competency trial, one of Allen's attorneys, Toure, testified that while it was his opinion that Allen was not competent because he could not assist counsel in preparing a defense (the second prong of the competency test), he did in fact understand the charges (the first prong of the competency test). At the plea proceeding, Allen assured the court he had reviewed the charges with Baumann, his counsel. He certified the same in writing in the "Plea of Guilty Without Sentencing - Summary of Facts" which he filed with the court and which Baumann countersigned. (*Id.*) In open court, Baumann informed the court that Allen had assisted her in presenting any defenses he might have to the charge. In our view, this statement necessarily includes, because it would not otherwise make sense, an assurance that she had reviewed with Allen the intent element of the charge. We next weigh in the mix Allen's affidavit of

_____

[19]The Information reads in pertinent part:

On or about the 21st day of November, 1986, A.D., the crime of murder in the first degree was feloniously committed in Oklahoma County, Oklahoma, by Garry Thomas Allen who wilfully, unlawfully and with malice aforethought, killed Lawanna Gail Titsworth by shooting her with a handgun, inflicting mortal wounds which caused her death . . . .

(R. Vol. 4, Original R. (C-88-37) at 1.)

-41-

factual basis submitted to the court at the plea hearing. Penned in his own handwriting, it is both simple and inartful: "I shot & killed Gail Titsworth. I had no justifiable cause." (*Id.* at 234.) Although it is curt, the statement admits to a *deliberate* and *unexcused* act of homicide, fitting well within the definition of malice aforethought. It evidences Allen understood the intent element through discussion with his attorneys. In fact, Baumann testified she helped him prepare it.

The record provides sufficient factual basis to engage the presumption that Allen's counsel informed him of the intent element for the offense with which he was charged.[20] The only evidence Allen submits in his effort to overcome the presumption are Baumann's conclusions,[21] memorialized a decade or more after the fact, that Allen did not understand the required intent.[22] We have already

---

[20]We distinguish *Miller*. There, as in *Henderson*, the defendant was charged with first degree murder and pled guilty to second degree murder (involving a different intent element) without benefit of a substitute charging instrument having been issued and served which would have alerted to the new intent element. *See Henderson,* 426 U.S. at 645; *Miller v. Champion,* 161 F.3d 1249, 1256 (10th Cir. 1998). In *Miller,* the record was devoid of any other evidence, direct or indirect, that Miller's counsel or the court advised him of the intent element for second degree murder. *Id.* at 1254-55.

[21]Allen's reliance on Dr. Gelbort's affidavit is misplaced for the reasons discussed in the previous section.

[22]In her statements Baumann does not say she neglected to perform an attorney's fundamental duty of explaining the elements of a charged crime to a client. Instead, her statements blur acts and conclusions. Moreover, they conflate Allen's ability to understand the meaning of 'malice aforethought' (intent element of first degree murder) with the intent element of manslaughter (a potential lesser-included offense). In the 1999 declaration she prepared for federal habeas relief, Baumann is silent as to the operative fact question – whether she explained

-42-

characterized these statements and need not elaborate further, except to say they are at significant variance with other evidence contemporary to the plea, including Baumann's own assurances to the trial court. None of her statements overcomes the presumption Allen was appropriately advised.

To be sure the trial court might have engaged in a more exhaustive plea colloquy with Allen to assure he understood both the meaning of malice aforethought and that it was an important element of the charge against him.

---

"malice aforethought" to Allen. (Appellant Br., Attach. J, ¶11.) However, quite unequivocally, she makes a different fact statement – she never explained manslaughter as a lesser-included offense. She then states her conclusion – Allen was "incapable of understanding 'malice aforethought' both because he did not remember the crime and because he was not able to conceptualize the intent element." (*Id.*) Her conclusions may trigger a need for further inquiry, but only if adequately supported by facts. We do not find such factual support.

In spite of the 1999 declaration, in her 2001 federal habeas testimony Baumann could not remember whether she discussed lesser-included offenses with Allen. (R. Vol. 2 at 22.) The shifting sands of recent memory are an unstable foundation and her imprecise recollection of whether or not she and Allen discussed lesser included offenses (and, hence, the issue of intent) is of dubious utility. Particularly so since it stands in stark contrast to her bold statement to the judge when the plea was entered that Allen had assisted her in presenting any defenses he might have to the charge of first degree murder. (R. Vol. 3, Tr. Change-of-Plea at 4.) A defense would include argument for conviction of only a lesser crime. In this case the distinction between the charged crime and a lesser one would necessarily turn on intent.

The district court avoided deciding whether Baumann had discussed the intent element of first degree murder with Allen and made no findings in that regard. It resolved the voluntariness of the plea on the basis of *Miller's* third requirement. *See* n.18. While we agree with the district court on the third requirement we are less charitable with regard to the second. The record does not demonstrate a credible factual predicate for Baumann's conclusions, so Allen fails to meet *Miller's* second requirement.

However, we are satisfied from the record as a whole that Allen obtained a sufficient understanding of the required intent from his counsel.

Even if we were to conclude that Allen satisfied the second requirement of the *Miller* test, he fails to satisfy the third, being a demonstration he was not put on notice of the intent element from sources other than his counsel. First, the record of his two arraignments shows he was provided a copy of the Information each time. Unlike many of the complex and convoluted federal indictments, the Information in Allen's case clearly and succinctly sets forth the elements of the crime charged. *See infra* n.19. And under Oklahoma law the language is neither subtle or arcane. *See infra*, pp. 40-41. Moreover, as we earlier noted, he acknowledged reviewing the charge with counsel. The language of the Information, focused by the sobering knowledge that he faced the death penalty,[23] would alert even an unsophisticated man that he was charged 1) with killing another, 2) the killing was intentional – not the result of mistake, accident, or other innocent reason, and 3) the killing was not, somehow, excused. In spite of perhaps unfamiliar language the concept is not elusive.

Second, Allen attended the preliminary hearing and heard the State present its case, which included the testimony of two witnesses who said Allen first shot Titsworth twice in the chest, examined her body for wounds, and then, after she stood up and tried to escape by entering the daycare center, he pushed her down and shot her again twice in the back, at close range. *See Worthen v. Meachum,*

---

[23]The trial court assured itself at the plea proceeding that Allen understood that the penalty he faced in the event of a plea of guilty was life in prison or death. (R. Vol. 3, Tr. Change-of-Plea at 4-5.)

842 F.2d 1179, 1183 (10th Cir. 1988) (presence of defendant at preliminary hearing an ingredient to consider when evaluating a claim of lack of knowledge of elements of crime). The testimony evidences a cool, deliberate and merciless intent to kill, certainly sufficient for one to infer malice aforethought. And one such as Allen, with the Information in hand, could consider and compare the evidence presented at the preliminary hearing with the charging language and reason accordingly, drawing reasonable inferences about the deliberate nature of the offense.

While we acknowledge the reasoning process we attribute to Allen is not singularly compelling and would be insufficient, standing alone, to support a conclusion he understood the intent element, we are comforted in our conclusion that Allen fails to meet the third requirement of the *Miller* test by the assurances he gave to the trial court at the plea hearing that he was acting knowingly and voluntarily and that his factual basis statement was correct. As an appellate court, we do not enjoy the trial court's advantage of having personally observed and evaluated the synergistic effect of Allen's behavior, demeanor and statements when he entered his plea. This being so, we place special reliance on the trial court's measure of Allen's understanding of the nature and consequence of his plea. The trial court's evaluation is necessarily based not only on the bare colloquy of the record that we see but also on its intuitive sense, undergirding the colloquy, that Allen understood the elements of the crime to which he was pleading. And this is true whether Allen's understanding emanated from discussion with counsel, sources independent of counsel or both.

Taken together, the indicia of the record demonstrate Allen acquired knowledge of the intent element of the crime from sources other than his counsel and that he entered his plea with the benefit of this knowledge. Failing two of the three *Miller* requirements, the claim that Allen did not knowingly and voluntarily enter his plea goes wanting.

Our role is not to undo what in hindsight may seem to Allen to have been an unwise choice to plead guilty to murder. Our role, instead, is to assure that the proceedings leading to his conviction and sentence were free of constitutional error. We conclude they were, and the determination of the state court in *Allen I* that Allen's plea was knowingly and voluntarily entered comfortably survives review under § 2254(d).

**D. Ineffective Assistance of Trial Counsel**

Allen claims trial counsel was ineffective because she misrepresented his competency to the trial court and permitted him to enter a blind plea of guilty to first degree murder instead of litigating his case in front of a jury when he had persuasive defenses (manslaughter as a lesser-included offense, involuntary intoxication, temporary insanity) that would have avoided a conviction in the liability stage of the trial and, failing that, would have avoided the punishment of death in the penalty stage. Allen first raised this claim in state post-conviction proceedings. The OCCA procedurally barred the claim on the ground it was apparent from the trial court record and could have been, and was not, raised on direct appeal. *Allen v. Oklahoma*, No. PC 97-311 (Okla. Crim. App. July 20, 2998) (*Allen IV*) (citing to OKLA. STAT. ANN. tit. 22, § 1089, a provision of

-46-

Oklahoma's Post-Conviction Procedure Act, OKLA. STAT. ANN. tit. 22, §§ 1080-1089). In federal habeas review, the district court, citing to *Walker,* 167 F.3d at 1345, elected not to recognize the procedural bar because it was based on a 1995 amendment to § 1089 that post-dated Allen's direct appeal. It reviewed the claim on its merits. On appeal, the state objects to the district court's disregard of the state procedural bar, maintaining that even prior to the 1995 amendment claims of ineffective assistance which could have been, and were not, raised on direct appeal were regularly barred. We agree with the district court, both for the reason it gave and because of our previously expressed skepticism as to the adequacy of Oklahoma's procedural bar of ineffective assistance of counsel claims not brought on direct appeal. *See English v. Cody,* 146 F.3d 1257 (10th Cir. 1998). We review de novo. *Mitchell,* 262 F.3d at 1045.

In order to make out a claim of ineffective assistance of counsel, Allen must show counsel's performance was deficient and it prejudiced his defense. *Strickland v. Washington,* 466 U.S. 668, 687 (1984). Deficient assistance of counsel is representation that "[falls] below an objective standard of reasonableness." *Id.* at 688. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687. Recall Baumann assured the trial court that Allen was competent to enter a plea; a decade later, she declared to the contrary. We avoid a discussion of whether Baumann's performance was deficient, assume for the sake of analysis that it was, and turn straight to an evaluation of prejudice. *Id.* at 697.

Prejudice to the defense "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* at 687. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

By way of preface, we identify an apparent illogic in Allen's position. On the one hand, he argues Baumann's deficient performance caused him to plead guilty while he was incompetent. On the other hand, he argues her deficient performance deprived him of a jury trial where certain defenses would have exonerated him or, at the very least, would have enabled him to avoid the death penalty. We are perplexed because if Allen was incompetent to enter a plea he would have been remanded for treatment. *See* OKLA. STAT. ANN. TIT. 22, § 1175.6. He would not have been permitted to proceed to trial. Perhaps Allen is suggesting that if and when he recovered competency after treatment he would have elected a jury trial. Whatever may be the camouflaged logic of his argument, we take up his claims.

We evaluate whether, absent Baumann's failure to advise the trial court of her client's incompetency, the court would have nonetheless found him competent to enter a plea. While the observations of defense counsel are valuable, "the concerns of counsel alone are insufficient to establish doubt of a defendant's competency." *Bryson,* 187 F.3d at 1202. In this case, the record as a whole contains compelling evidence of Allen's competence. Every expert witness who

testified at the competency trial, including Allen's own *Ake* expert, testified he was competent. Furthermore, the court conducted its own evaluation of Allen's competency through colloquy with him and observation of his behavior. *Id.* at 1201 ("A trial court may rely on its own observations of the defendant's comportment."). At sentencing, Allen articulately explained his wish to plead guilty. Based on this record, we conclude Allen has not demonstrated the trial court would have prevented him from entering a plea on the basis of incompetency if only his counsel had been truthful with the court in her estimation of his mental state. Thus, even assuming trial counsel misrepresented Allen's competence to the trial judge and was ineffective in so doing, no prejudice resulted and Allen fails in his claim of ineffective assistance of counsel.

## IV.   *Conclusion*

Accordingly, we **AFFIRM** the order of the district court.