**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**DEC 21 2004**

**PATRICK FISHER**
**Clerk**

PUBLISH

### UNITED STATES COURT OF APPEALS

### TENTH CIRCUIT

---

PEGGY SUE SAIZ,

        Petitioner - Appellant,

    v.

JOE ORTIZ, Executive Director of the
Colorado Department of Corrections,
and KEN SALAZAR, Attorney
General of the State of Colorado,

        Respondents - Appellees.

No. 03-1292

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. NO. 98-D-68)**

---

Walter L. Gerash, Law Office of Walter L. Gerash, Denver, Colorado, for
Petitioner-Appellant.

Michael J. Milne, Senior Deputy District Attorney (Robert S. Grant, District
Attorney, and Steven L. Bernard, Assistant District Attorney, with him on the
brief), Adams County District Attorney's Office, Brighton, Colorado, for
Respondents-Appellees.

---

Before **MURPHY**, **ANDERSON**, and **HARTZ**, Circuit Judges.

---

**ANDERSON**, Circuit Judge.

---

Peggy Sue Saiz was convicted of first-degree murder and sentenced to life imprisonment. Her conviction was affirmed on appeal. She then filed a federal habeas petition under 28 U.S.C. § 2254, which the federal district court granted. On appeal from that grant, we reversed and remanded the case to the district court to apply the correct standard of review under the Antiterrorism and Effective Death Penalty Act. On remand, applying the correct standard of review, the district court denied her relief. This appeal followed. For the following reasons, we affirm the district court's denial of this second habeas petition.

**BACKGROUND**

We take the following undisputed facts from our previous decision in this case:

> On November, 9, 1990, [Saiz] shot her husband, George Saiz, four times in the back of the head while he slept. Afterwards, to simulate a burglary, she collected valuable items from their home and stored them at her mother's home and at the home of a man with whom she was having an affair. [Saiz] initially told police she had returned home to find her husband dead and the home burglarized. After repeated police interviews, [Saiz] admitted she shot and killed her husband but claimed she acted in self defense. [Saiz] asserted George Saiz had physically abused her over the course of their four-year marriage and, on the day of the homicide, had threatened to kill her.

> A Colorado grand jury indicted [Saiz] on one count of first-degree murder. [Saiz] initially pled not guilty by reason of insanity and asserted a defense of impaired mental condition. The court ordered a pretrial examination pursuant to Colorado statute, and

appointed Dr. Kathy Morall to examine [Saiz]. Dr. Morall issued two psychiatric reports, concluding in both that [Saiz] was legally sane when she shot and killed her husband. After a sanity trial, at which Dr. Morall and several defense experts testified, a jury determined [Saiz] was legally sane at the time of the shooting.

At her trial on the substantive charges, [Saiz] withdrew the impaired mental condition defense and argued she acted in self defense. The defense presented several medical and psychological expert witnesses, each of whom testified [Saiz] was a battered woman and had killed her husband in self defense. In rebuttal, the prosecution called Dr. William Hansen, who reviewed the test results relied upon by the defense's experts and testified that the psychological tests given were insufficient to support a conclusion that [Saiz] suffered from battered women's syndrome. The prosecution also called five physical therapists and three doctors who had treated or evaluated [Saiz] for job-related injuries in the year preceding the shooting. Each testified [Saiz] did not have unexplained bruises or other injuries, and did not appear to exhibit symptoms normally associated with battered women's syndrome. Over [Saiz's] objection, the trial court also allowed Dr. Morall to testify in rebuttal. Dr. Morall testified that, in her expert opinion as a psychiatrist, [Saiz] did not suffer from battered women's syndrome.

After admitting Dr. Morall as an expert, the court restricted [Saiz's] attempts to impeach Dr. Morall. Although permitting defense counsel to cross-examine the psychiatrist on her role in other trials and her possible bias in favor of the prosecution, the court did not allow [Saiz] to call in surrebuttal two criminal defense attorneys who had previously worked with the psychiatrist and would offer impeachment evidence in the form of opinion testimony concerning Dr. Morall's poor character and reputation for truthfulness.

Saiz v. Burnett, 296 F.3d 1008, 1010-11 (10th Cir. 2002) (footnote omitted).

The jury found Saiz guilty of first-degree murder and the court sentenced her to life imprisonment without the possibility of parole. The Colorado Court of Appeals affirmed her conviction and sentence on direct appeal, People v. Saiz,

-3-

923 P.2d 197 (Colo. Ct. App. 1996), cert. denied (Sept. 3, 1996), cert. denied, 519 U.S. 1069 (1997), addressing and rejecting the four claims she raised. The Colorado and United States Supreme Courts denied certiorari.

Saiz then filed a petition for a writ of habeas corpus raising the same four claims she had raised in her direct appeal. The federal district court granted her relief on one issue—whether the Colorado Court of Appeals properly addressed her argument that her Sixth Amendment right to confront witnesses had been violated when the trial court refused to permit Saiz to call in surrebuttal two criminal defense attorneys to impeach Dr. Morall's credibility. The Colorado court concluded it was error not to permit her to call those witnesses, but the error was harmless under Chapman v. California, 386 U.S. 18, 24 (1967), in part because Dr. Morall's testimony was "not crucial to the prosecution's case because other expert witnesses also testified that the results of [Saiz's] psychiatric tests suggested that she did not suffer from battered women's syndrome or post traumatic-stress disorder." Saiz, 923 P.2d at 204.

The federal district court found the state court's harmless error analysis to be "incorrect," Saiz v. McGoff, No. CIV. A. 98-D-68, 2001 WL 629663, at *4 (D. Colo. May 23, 2001), rev'd, 296 F.3d 1008 (10th Cir. 2002), because it was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding" under 28 U.S.C. § 2254(d)(2). Having

granted Saiz conditional release on the basis of that single issue, the district court did not address her other three arguments.

On appeal, we reversed the district court and remanded the case. We explained that "the AEDPA bars a federal habeas court from granting relief unless the state court decision involves either 1) application of an incorrect legal standard or principle; or 2) an objectively unreasonable application of the correct legal standard or principle." Saiz, 296 F.3d at 1012. We reversed the district court's grant of a writ in Saiz's favor, holding that the district court failed to apply the "objectively unreasonable" standard to the Colorado Court of Appeals' Chapman harmless error review.[1] On remand, the district court, applying the proper standard of review under the AEDPA, denied her application for a writ, holding that she was not entitled to relief on any of the four claims she asserted. That denial is before us.

Saiz raises three issues on appeal: (1) Saiz's rights under the Equal Protection Clause of the Fourteenth Amendment were violated because, during voir dire, the trial court permitted the prosecution to strike by peremptory

---

[1] We observed that the "district court concluded that the Colorado appellate court's application of Chapman was incorrect," rather than "objectively unreasonable." Saiz, 296 F.3d at 1012. We also held that the district court erred in reviewing the Colorado court's decision under 28 U.S.C. § 2254(d)(2) instead of 28 U.S.C. § 2254(d)(1), because "'[h]armless error is a mixed question of law and fact.'" Saiz, 296 F.3d at 1012 n.2 (quoting Johnson v. Gibson, 254 F.3d 1155, 1166 (10th Cir. 2001)).

challenges eight female and Hispanic potential jurors, in violation of <u>Batson v. Kentucky</u>, 476 U.S. 79 (1986), and <u>J.E.B. v. Alabama</u>, 511 U.S. 127 (1994); (2) her Fifth Amendment privilege against self-incrimination was violated when the trial court erroneously allowed Dr. Morall to testify at Saiz's trial on the substantive charges as to opinions Dr. Morall derived from examining Saiz in connection with her sanity trial, in violation of Colo. Rev. Stat. § 16-8-107(1);[2] (3) her Sixth Amendment right to confrontation was violated when the trial court erroneously restricted her cross-examination and impeachment of Dr. Morall by (a) prohibiting cross-examination relating to Dr. Morall's involvement as a prosecution advisor in a highly publicized unrelated murder trial, (b) prohibiting cross-examination relating to a case where Dr. Morall was found in contempt of court and derelict in her duties as a forensic expert, and (c) prohibiting surrebuttal opinion testimony as to Dr. Morall's character and reputation for truthfulness.[3]

---

[2]Section 16-8-107(1) "prohibits the prosecution from using, at trial on the substantive offense, evidence first derived from communications between a defendant and a court-appointed psychiatrist during a sanity examination." <u>Saiz</u>, 296 F.3d at 1011.

[3]The district court denied Saiz a certificate of appealability ("COA"), which is a prerequisite to appealing the denial of a habeas petition. 28 U.S.C. § 2253(c)(1). "A COA should issue if the applicant has 'made a substantial showing of the denial of a constitutional right,' 28 U.S.C. § 2253(c)(2), which we have interpreted to require that the 'petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong.'" <u>Tennard v. Dretke</u>, 124 S. Ct. 2562, 2569 (2004) (quoting <u>Slack v. McDaniel</u>, 529 U.S. 473, 484 (2000)). Construing Saiz's notice of

(continued...)

-6-

## I.   Batson Claim

The Supreme Court in Batson held that the Fourteenth Amendment's Equal

Protection Clause prohibits the prosecution's use of peremptory challenges to

exclude potential jurors on the basis of their race.  Batson, 476 U.S. at 86.  The

Court extended that same prohibition to peremptory challenges used to exclude

potential jurors because of their gender.  J.E.B., 511 U.S. at 130-31.  The Court

articulated a three-part procedure to evaluate claims that the prosecution

impermissibly used its peremptory jury challenges:

> First, a defendant must make a prima facie showing that a
> peremptory challenge has been exercised on the basis of race.
> Second, if that showing has been made, the prosecution must offer a
> race-neutral basis for striking the juror in question.  Third, in light of
> the parties' submissions, the trial court must determine whether the
> defendant has shown purposeful discrimination.

Miller-El v. Cockrell, 537 U.S. 322, 328-29 (2003) (citing Batson, 476 U.S. at 96-

100); see also Purkett v. Elem, 514 U.S. 765, 767 (1995) (per curiam).  The party

objecting to the use of peremptory strikes, Saiz in this case, "carries the ultimate

burden of persuasion."  United States v. Castorena-Jaime, 285 F.3d 916, 928

(10th Cir. 2002); see also Purkett, 514 U.S. at 768.

In this case, Saiz alleges that the prosecution used eight out of nine

peremptory challenges to remove the following potential Hispanic and female

---

[3](...continued)
appeal as an application for a COA, we grant Saiz a COA.

-7-

jurors: Dale Hall, a female; Pamela Wagner, a female; Jay Alire, a Hispanic male; Loretta Jaramillo, a Hispanic female; Denise Baca, a Hispanic female; Linnea Eckhardt, a female; Eleanor Ellison, a female; and Marco Aubril, a Hispanic male. During voir dire, the prosecution first tried to remove Ms. Hall for cause, arguing that "[s]he basically indicated . . . that she could not follow the law if it differed from what . . . in her heart she thought should be done in the case." Tr. of Jury Trial, R. Vol. 21 at 43. The defense objected and the court asked Ms. Hall how she would respond if "what you feel the law should be is not the law as I give it to you." Id. at 46. When she responded, "I would have to go by the law," id., she was permitted to stay on the voir dire panel and the prosecution passed her for cause. Id. at 65. After further questioning, the defense also passed her for cause. Id. at 124. The prosecution subsequently used its first peremptory challenge to dismiss Ms. Hall. Id. at 125. The defense made no objection at the time.

The prosecution exercised its second peremptory challenge to exclude a female, Ms. Wagner, from the jury pool. Tr. of Jury Trial, R. Vol. 22 at 61. The defense made no objection. The prosecution exercised its third peremptory challenge to excuse Mr. Alire, a Hispanic male. Id. at 105. Again, there was no defense objection. When the prosecution exercised its fourth peremptory challenge, excusing Ms. Jaramillo, the court asked defense counsel if he would

-8-

like to approach the bench.  Id. at 138.  At the bench, the court stated, "[f]or the same reason that I ask[ed you to] approach the bench, this is the second Hispanic challenge out of four.  Is there any record you would like to make, Mr. Gerash?"  Id. at 138-39.  The following exchange then occurred:

> MR. GERASH [Defense counsel]:  Yes, Your Honor.  I would like to indicate that there were no cause—objections made by the prosecution concerning Mr. Alire or Ms. Jaramillo.  I would like to note that their surnames are Spanish.  I would like to say that Ms. Jaramillo had some battering experience in her family, a daughter.  Mr. Alire is a college graduate. . . .  I feel that the challenge is strictly based upon national origin or because of their surname.  And let the record reflect of course that my client—her maiden name was . . . Compos, Hispanic, and that she was married to Mr. Torres, a Hispanic, and she was married to Mr. Saiz, Hispanic, and I feel that they're doing it just on a national or racial basis. . . .
>
> THE COURT:  The only thing I'm going to request at this time is if the district attorney wants to, they can make a record.  I'm not making any finding but if you wish to make a record as to challenges, I will allow it at this point.
>
> MR. POLAND [Prosecutor]:  We'll be happy to, Your Honor.  Our record as to Mr. Alire is simply that Mr. Alire researches . . . attorneys all connected with the defense bar and it was pointed out by Mr. McCoy's questions of him, and specifically the criminal defense bar in Colorado and in the Denver area.[4]
>
> Likewise, he openly admitted that he was more critical . . . of the police due to research projects that he had been involved in. . . .

_____

[4]Mr. Alire had testified that he had participated in research regarding the way victims of police shootings, and their attorneys and relatives, viewed the police.  This brought him into contact with a number of attorneys, particularly criminal defense attorneys, in the Denver area.

As to Ms. Jaramillo, the basis for our peremptory challenge of Ms. Jaramillo has to do with the fact that her response to my question was she was satisfied with the outcome of her daughter's DUI. Her initial response was, well, [s]he didn't get off. And I believe that evinces a bias towards the defense. And we're not comfortable keeping someone with that sort of response on the jury.

THE COURT: Okay.

MR. GERASH: Excuse me, Your Honor. Also I'd like to note that three of their first challenges were women who would be perhaps more sensitive to the issues in this case.

Id. at 139-40. The defense moved for a mistrial. Without specifically ruling on that motion, or making any particular findings with regard to the defense challenge to the prosecution's use of its peremptory strikes or the prosecution's explanation for its strikes, the court called another prospective juror and voir dire continued.

The prosecution exercised its fifth peremptory challenge to excuse Ms. Baca. Id. at 197. Defense counsel asked to make a record:

MR. THOMPSON [Defense counsel]: Your Honor, once again, this is the People's fifth peremptory challenge. Ms. Baca, I understand, has a Hispanic surname, one of the five peremptory challenges that is Hispanic, three have been Hispanic and four being a woman. We think that the challenges are based upon national origin and, again, move for a mistrial on gender.

Id. at 198. The prosecution explained its use of the peremptory challenge:

MR. POLAND: Your Honor, the reason that we've excused Ms. Baca is that she's approximately a 26 year old woman who still lives at home with her parents. In the space of what I understand to be approximately a two-month period she picked up two no proof of

-10-

insurance charges which she now owes the Court 80 hours of community services for which she is, I think it's safe to say, at least not ahead of her responsibility in discharging that community service. And we simply don't feel like she has the responsibility or emotional maturity to serve on a first-degree murder case.

In addition, Ms. Baca served as part of a religious ministry to prisoners in the Department of Corrections and we have concern about whether she can be objective in serving on a criminal case because of that.

Id. at 198-99. The court subsequently stated that it was "not going to find any prima facie showing it is based upon the fact that this juror is Hispanic, and I'm not going to take any other action at this point." Id. at 199. The court then called another prospective juror and voir dire continued.

The prosecution exercised its sixth peremptory challenge to excuse Ms. Eckhardt. Id. at 233. Defense counsel again requested to make a record:

MR. GERASH: This is the fifth woman that they've challenged and the defendant is a woman. And in addition to that, Juror Eckhardt, No. 6, that was just chosen was passed. The Court passed this juror for cause after an extensive hearing in court. The record will reflect that this was a battered women and she had a lot of trauma in her family as a result of history of battering and it affected her children. And she described how she came out of it and how the children have matured.

And also on the issue of her casual business contact with Pearl Vargas [Saiz's sister], she did not even know the case. Pearl Vargas never talked to her about the case. She stated that if she would come in with a verdict of guilty, it would not bother her, that she was used to traumatic things. She would keep confidences and not discuss the matter with Vargas at any time before or after that. And after hearing that the Court passed her for cause.

. . .

-11-

They [the prosecution] have systematically excluded woman and also woman [sic] who are battered, and I feel that in essence they're visciating [sic] the terms of <u>Batson v. Kentucky</u>. . . . I think gender and national origin have been grounds whereby the prosecution should not systematically exclude these persons either because of gender or because of special circumstances that would deny the defendant a proper jury from a proper cross-section of the community, in addition to that have stricken three Chicanos and women, some who have had battering experiences and seem to me that they're carrying on a whole assault on women and minorities.

<u>Id.</u> at 234-36. At the court's invitation, the prosecution stated:

MR. POLAND: Your Honor, . . . our reason for excusing Ms. Eckhardt is twofold. One is that she told the Court upon questioning by Mr. McCoy that if she returned a verdict of guilty in this case, she in fact might try to avoid Pearl Vargas at work.

And the record should reflect that Pearl Vargas was called as a witness in the sanity trial. She was called by the defense. She was called in defense of her sister, the defendant. And among the important testimony that she testified to then, and that we expect her to testify to now, is that the defendant revealed to her battering by George Saiz, the deceased in this case, and revealed to her that specifically a rib injury that she supposedly suffered at work was actually inflicted by George Saiz. And Pearl Vargas testified that she knew that George Saiz had threatened to kill the defendant if she wanted a divorce.

. . . Pearl Vargas' credibility will be an extremely important thing for the jury to consider and Ms. Eckhardt told the Court that she sees Pearl Vargas as much as three times per day in her job and has had at least casual conversation with her fairly regularly.

The second reason that we excused Ms. Eckhardt is that when asked . . . without having heard any evidence, do you think the defendant in this case suffers from battered woman syndrome, she answered yes and that evinces a prejudgment about the case. That reflects bias that she has.

. . .

-12-

THE COURT: I would indicate that although were was no basis for a challenge for cause, Ms. Eckhardt has indicated that she has contact with Ms. Vargas two to three times a day and that it may be somewhat awkward for her, further that she has a long history of battering and abuse, not only in her own relationship but also in her children's relationships.

Again, this is not a challenge for cause. She indicated that she could be objective but there is a basis, not based upon gender, for the district attorney to challenge Ms. Eckhardt and the Court will accept the challenge as a peremptory challenge.

Id. at 236-38.

As voir dire continued, venire person Ms. Ellison was questioned about her ability to be just and fair, in light of her prior testimony to the court in chambers that she had suffered extensive abuse by her first husband. Tr. of Jury Trial, R. Vol. 21 at 143-51. She indicated she could. The prosecution subsequently used its seventh peremptory strike to excuse her. Tr. of Jury Trial, R. Vol. 23 at 21. Defense counsel objected:

MR. GERASH: At this time we move for a mistrial. This is the 5th challenge of a woman that is a battered woman. We spent half an hour when she unraveled the trails of her soul and life experiences. She answered my questions clearly. She is completely not biased. They are systematically excusing women who have had a battering experience.

And my client has been denied adequate jurors from an adequate prospect community because the prosecution has been excusing in this manner not respecting Batson, not respecting due process.

-13-

Id. at 22. The prosecution responded that they excused Ms. Ellison because she was friendly with a police department employee who testified at another highly publicized murder in which the defendant was represented by Mr. Gerash, Saiz's counsel. The prosecution was concerned that this connection would make her "lean towards the defense side of this case." Id. at 23. The defense responded that the police department employee was a prosecution witness, and therefore suggested that the prosecution's explanation was "specious." The court "f[ou]nd there is a rational basis for the challenge. Further, the Court . . . determine[s] that, at least at this point in time, that there are 8 female jurors still in the jury box out of 13 that are females." Id. at 24.

The prosecution used its final disputed peremptory challenge to excuse Mr. Aubril. Id. at 109. The defense objected, stating "the Court has dismissed five Hispanics from the jury." Id. at 110. Further, "what they are doing is systematically exercising the peremptory challenges, not only to Spanish male persons, but a person who expressed belief that oppression of women through domestic abuse is a national problem." Id. When the prosecution indicated later that it would use another peremptory strike against potential juror Rich Lehl, a Caucasian male, defense counsel objected that the prosecution was "trying to sanitize the jury as to—his interest is to systematically exclude all people who

-14-

have battering experiences." Id. at 144. The prosecution was not permitted to explain its reason for the peremptory strike.

### A. Standard of Review

Under the AEDPA, if a claim has been adjudicated on the merits in state court, we may only grant federal habeas relief if the habeas petitioner can establish that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. §§ 2254(d)(1), (2). See Williams v. Taylor, 529 U.S. 362, 412-13 (2000); see also Gipson v. Jordan, 376 F.3d 1193, 1196 (10th Cir. 2004). The AEDPA also mandates that state court factual findings are presumptively correct and may be rebutted only by "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Allen v. Mullin, 368 F.3d 1220, 1234 (10th Cir. 2004). "The disposition of a Batson claim is a question of fact subjected to the standard enunciated in 28 U.S.C. § 2254(d)(2)." Sallahdin v. Gibson, 275 F.3d 1211, 1225 (10th Cir. 2002); see also Weaver v. Bowersox, 241 F.3d 1024, 1029-31 (8th Cir. 2001); Cochran v. Herring, 43 F.3d 1404, 1408 (11th Cir. 1995) ("The ultimate question of whether [petitioner] has established

-15-

purposeful discrimination in violation of <u>Batson</u> is a question of fact subject to deferential review.").[5]

When applying these deferential standards in cases involving a state-court summary disposition, we focus on the result of the state court decision, not its reasoning. "[W]e defer to the [state appellate court's] decision unless we conclude that its result—not its rationale—is legally or factually unreasonable." <u>Gipson</u>, 376 F.3d at 1197; <u>see also</u> <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002) (noting that a state court decision is not contrary to clearly established Supreme Court precedents even where the state court decision indicates no awareness of those precedents "so long as neither the reasoning nor the result of the state-court decision contradicts them"); <u>Wright v. Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002) ("The statutory language focuses on the result, not on the reasoning that led to the result. . . ."); <u>Santellan v. Cockrell</u>, 271 F.3d 190, 193 (5th Cir.

---

[5]We note that some other circuits have held that "<u>Batson</u> claims constitute mixed questions of law and fact for purpose of federal habeas corpus review." <u>Hardcastle v. Horn</u>, 368 F.3d 246, 254 (3d Cir. 2004). The First Circuit has stated that "[a] careful reading of <u>Batson</u> convinces us that, although this determination [of whether a defendant has established a *prima facie* case of discrimination under <u>Batson</u>] can be characterized as a mixed question of law and fact, it is fact-sensitive, and, therefore, should be reviewed under the familiar clear-error standard." <u>United States v. Bergodere</u>, 40 F.3d 512, 516 (1st Cir. 1994) (citing other cases); <u>see also</u> <u>Tolbert v. Page</u>, 182 F.3d 677, 684 (9th Cir. 1999) (en banc) (noting it was joining the majority of its sister circuits in "holding that the appellate court should review a trial court's <u>Batson</u> prima facie determination deferentially").

-16-

2001) ("Other circuit courts likewise focus on the result of a state court's consideration of a prisoner's claim."); Aycox v. Lytle, 196 F.3d 1174, 1177 (10th Cir. 1999) ("[W]e owe deference to the state court's *result*, even if its reasoning is not expressly stated."); cf. Rompilla v. Horn, 355 F.3d 233, 248 (3d Cir. 2004) ("[I]f the state court decided the claim, the § 2254(d)(1) standards govern—regardless of the length, comprehensiveness, or quality of the state court's discussion."), cert. granted, 125 S. Ct. 27 (2004).  As the Second Circuit said, "[a]lthough sound reasoning will enhance the likelihood that a state court's ruling will be determined to be a 'reasonable application' of Supreme Court law, deficient reasoning will not preclude AEDPA deference, at least in the absence of an analysis so flawed as to undermine confidence that the constitutional claim has been fairly adjudicated." Cruz v. Miller, 255 F.3d 77, 86 (2d Cir. 2001) (internal citations and quotations omitted).  Nevertheless, as we have recently observed, "[t]his court has not applied the rule of Aycox . . . in a situation where the state court's explicit reasoning contravenes Supreme Court precedent." Brown v. Uphoff, 381 F.3d 1219, 1225 (10th Cir. 2004).  Because the Colorado Court of Appeals analyzed Saiz's claims in a fully reasoned opinion, and because, as set out below, that reasoning does not contradict Supreme Court precedent, we need not analyze further how the Aycox rule applies outside of the summary disposition context.

When applying these deferential AEDPA standards, "we review the district court's legal analysis of the state court decision de novo." Allen, 368 F.3d at 1234. "If the district court's factual findings depend entirely on the state court record, we independently review that record," id.; see also Walker v. Gibson, 228 F.3d 1217, 1225 (10th Cir. 2000), bearing in mind that, as indicated above, state court factual findings are presumptively correct and only to be rebutted by clear and convincing evidence.

## B. Application of AEDPA to Batson Claim

The Colorado Court of Appeals clearly addressed Saiz's Batson claim on its merits, so we must accord its decision deference under the AEDPA. As the court noted, Saiz "contend[ed] that the trial court erred by permitting the prosecution systematically to exclude women and Hispanics from the jury without following the procedure set forth in Batson. . . ." Saiz, 923 P.2d at 205. The court concluded that "[w]hile we agree that the trial court failed to follow the procedures in Batson, we find no reversible error." Id. The court's explanation was as follows:

> [T]he trial court failed to follow the three step procedure of Batson. Several times during selection of the jury, the trial court failed to rule on whether defendant had made a *prima facie* showing of purposeful discrimination. The court also allowed the prosecution to articulate neutral reasons for the exclusion of certain jurors without finding that defendant had made a *prima facie* showing.

-18-

However, we conclude that the trial court properly determined, under the circumstances here, that defendant failed to make a *prima facie* showing of purposeful discrimination based on race or gender. As the trial court noted, the final jury included six individuals with Hispanic surnames and nine women, including alternates. Thus, defendant failed to show that members of a cognizable group were underrepresented on the jury.

Id. at 206.

The state court correctly identified the applicable federal law—the Equal Protection right recognized in Batson. It also correctly observed that Batson requires courts to follow a three-step process to ensure that peremptory strikes are not used to unconstitutionally exclude potential jurors on the basis of their race or gender. And, while we disagree with some of its reasoning, we conclude that the state court decision did not result in an unreasonable determination of the facts of Saiz's case in light of the evidence presented in the state court proceeding, nor did it unreasonably apply federal law.

Saiz argues the Colorado Court of Appeals erroneously "concluded that [Saiz] failed to make a *prima facie* showing of purposeful discrimination, relying solely on the fact that the ultimate jury panel included several individuals with Hispanic surnames and women." Appellant's Br. at 31. She argues that the ultimate composition of the jury is not dispositive of whether there was a Batson violation.

-19-

Saiz's initial obligation under <u>Batson</u> was to make a *prima facie* showing that the prosecution's peremptory strikes were discriminatory. Our independent review of the record reveals that (1) Saiz failed to make such a *prima facie* case with respect to two of the eight potential jurors, Ms. Hall and Ms. Wagner; (2) the trial court implicitly ruled that she had failed to make a *prima facie* showing with respect to a third juror, Mr. Aubril; and (3) the existence of a *prima facie* case became moot once the prosecution offered explanations for its strikes of the remaining five jurors.

### i. *Prima facie* case

Saiz made no objection to the prosecution's first four peremptory strikes, against Ms. Hall, Ms. Wagner, Mr. Alire and Ms. Jaramillo. The court brought the issue to counsel's attention after the prosecution's fourth peremptory strike, inviting defense counsel to make a record. It was only at that point that defense counsel specifically noted that Mr. Alire and Ms. Jaramillo had Hispanic surnames. Defense counsel made no specific argument about Ms. Hall or Ms. Wagner, other than to assert at the very end of the colloquy that three of the first four jurors struck were women.[6] It is clear, however, that the focus of the court

---

[6]To establish a *prima facie* case of intentional discrimination, a defendant must show that the prosecution has exercised its peremptory strikes to remove minority jurors or jurors of a particular gender as well as facts and relevant circumstances which raise an inference that the prosecution used its peremptory

(continued...)

-20-

in initiating the Batson inquiry, the prosecution in its explanations, and defense counsel in his argument, was on the two Hispanic jurors, Mr. Alire and Ms. Jaramillo. Thus, Saiz failed to establish a *prima facie* case with respect to Ms. Hall and Ms. Wagner.

The last juror at issue in this case, Mr. Aubril, was dismissed in unusual circumstances. After he had been questioned by both the prosecution and defense counsel, the prosecution notified that court that it "intend[ed] to exercise our challenge as to Mr. Aubril." Tr. of Jury Trial, R. Vol. 23 at 109. Defense counsel then "ask[ed] for a mistrial. Or the alternative to keep—to prevent them from the peremptory challenge as to Mr. Aubril. And the grounds of that is, the Court has dismissed five Hispanics from the jury. There is no showing there is a basis for the challenge." Id. at 110. He then stated that "we feel that . . . they're exercising their peremptory challenges in a discriminatory manner towards my client." Id. When the prosecution thereafter dismissed Mr. Aubril, defense counsel made no further objection. The trial court did not invite the prosecution to explain its exercise of the peremptory strike and the prosecution made no attempt to do so. We may infer from the trial court's decision not to go on to step

<hr>

[6](...continued)
strikes to exclude potential jurors on the basis of race or gender. See Batson, 476 U.S. at 96; see also United States v. Esparsen, 930 F.2d 1461, 1465 (10th Cir. 1991).

two of the <u>Batson</u> analysis (asking the prosecution to explain its peremptory strike) that it concluded that Saiz had failed to establish a *prima facie* case of discrimination in connection with the peremptory strike of Mr. Aubril.[7]  That finding by the trial court has not been rebutted by clear and convincing evidence.

Thus, with respect to venire persons Hall, Wagner and Aubril, while the Colorado Court of Appeals found that the trial court had "[s]everal times . . . failed to rule on whether [Saiz] had made a *prima facie* showing," <u>Saiz</u>, 923 P.2d at 206, our independent review of the record reveals that the trial court had simply failed to make an *explicit* ruling on the record with respect to Hall, Wagner and Aubril.  Having determined that the record reveals that Saiz failed to make a *prima facie* case of discrimination with respect to the three venire persons, we can conclude that the Colorado Court of Appeals' ultimate decision that Saiz failed to show "purposeful discrimination" with respect to those three was a reasonable determination of the facts and a reasonable application of <u>Batson</u> to this case.

---

[7]When the prosecution announced it was going to exercise its peremptory challenge on Mr. Aubril, it stated that its action was "[b]ased on Mr. Aubril's responses to the Court's inquiry. . . ."  Tr. of Jury Trial, R. Vol. 23 at 109.  Mr. Aubril had indicated several times, in response to questions from the court, that his "feelings about society," including "women beaters," would undermine his ability to fairly serve as a juror.  <u>Id.</u> at 103-04.

-22-

With respect to the other five jurors, while the trial court did not specifically rule on whether or not Saiz had established a *prima facie* case,[8] the court invited the prosecution to explain its use of peremptory strikes and the prosecution offered explanations. Accordingly, "we may assume [Saiz] established a *prima facie* <u>Batson</u> showing," given that "the court went on to analyze steps two and three of the <u>Batson</u> inquiry." <u>Castorena-Jaime</u>, 285 F.3d at 928. <u>See</u> <u>United States v. Johnson</u>, 941 F.2d 1102, 1108 (10th Cir. 1991) (noting that review of a *prima facie* showing becomes moot after the prosecution has offered a racially neutral explanation for the peremptory strike) (citing <u>Hernandez v. New York</u>, 500 U.S. 352, 359 (1991) (plurality opinion)). The Colorado Court of Appeals correctly observed that the court allowed the prosecution to articulate its neutral reasons for exercising the peremptory strikes, although the state court apparently failed to state the legal consequence of that—i.e., that the existence of a *prima facie* case becomes moot.

---

[8]We acknowledge that the court actually specifically stated it was not making any finding as to the existence of a *prima facie* case with respect to Ms. Baca, but it proceeded to hear the prosecution's explanation for the challenge. As discussed above, in that situation, the existence or not of a *prima facie* case becomes moot.

### ii. Prosecution's explanations

We now consider whether the state court reasonably determined the facts as they relate to step two of the Batson inquiry. At step two, the prosecution must offer race-neutral explanations for the peremptory strikes. "The second step of this process does not demand an explanation that is persuasive, or even plausible." Purkett, 514 U.S. at 767-68. Rather, "'the issue is the facial validity of the prosecutor's explanation,'" so "'[u]nless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral.'" Id. at 768 (quoting Hernandez, 500 U.S. at 360). "A neutral explanation means an explanation based on something besides the race of the juror." Hidalgo v. Fagen, Inc., 206 F.3d 1013, 1019 (10th Cir. 2000).

The Colorado Court of Appeals noted that the prosecution articulated "neutral reasons for the exclusion of certain jurors. . . ." Saiz, 923 P.2d at 206. That was not an unreasonable determination of the facts in this case. The record reveals that the prosecution offered race- and/or gender-neutral explanations for the peremptory strikes of the five venire persons for whom a *prima facie* showing was established: Mr. Alire, Ms. Jaramillo, Ms. Baca, Ms. Eckhardt, and Ms. Ellison. The trial court actually found that the prosecution's gender-neutral

-24-

explanations for the strikes of Ms. Eckhardt and Ms. Ellison were adequate.[9]  Saiz

does not dispute, or rebut the correctness of, the court's findings as to those two

potential jurors.  She also does not dispute the adequacy of the prosecution's

explanations for the strikes of Mr. Alire, Ms. Jaramillo and Ms. Baca, thereby

waiving an argument that the prosecution failed to satisfy step two of the Batson

inquiry with respect to the five venire persons for whom the prosecution gave

race- and/or gender-neutral explanations.


### iii.  Ultimate conclusion as to purposeful discrimination

Accordingly, we are left with the question of whether the Colorado Court

of Appeals reached a reasonable result under Batson in concluding that "the trial

court properly determined . . . that defendant failed to make a *prima facie*

showing of purposeful discrimination based on race or gender," partly in reliance

on the fact that the final jury included six Hispanic jurors and nine women.  Saiz,

923 P.2d at 206.  Saiz makes two arguments on this point:  first, she asserts the

trial court failed to satisfy the third Batson step because it made no findings on

the record that it found the prosecution's race- and/or gender-neutral explanations

---

[9]The court stated that "there is a basis, not based upon gender, for the
district attorney to challenge Ms. Eckhardt and the Court will accept the challenge
as a peremptory challenge."  Tr. of Jury Trial, R. Vol. 22 at 238.  With respect to
Ms. Ellison, the court found that "there is a rational basis for the challenge."  Tr.
of Jury Trial, R. Vol. 23 at 24.

-25-

for striking the jurors credible, reasonable or believable; and second, she argues the Colorado Court of Appeals placed exclusive reliance on the ultimate composition of the jury in finding no Batson violation. We reject both arguments.

While the trial court failed to *explicitly* find the prosecution's explanations race- and/or gender-neutral, it did refuse to overturn the prosecution's peremptory strikes and permitted voir dire to continue. We have faced a similarly scant trial record before. What we said then applies with equal force here:

> Although we affirm the district court's ruling, we encourage district courts to make explicit factual findings on the record when ruling on Batson challenges. "Specifically, . . . a district court should state whether it finds the proffered reason for a challenged strike to be facially race neutral or inherently discriminatory and why it chooses to credit or discredit the given explanation." . . . A district court's clearly articulated findings assist our appellate review of the court's Batson ruling, and "ensure[] that the trial court has indeed made the crucial credibility determination that is afforded such great respect on appeal."

Castorena-Jaime, 285 F.3d at 929 (quoting United States v. Perez, 35 F.3d 632, 636 (1st Cir. 1994)). While explicit rulings are preferable, we can conclude in this case that the trial court implicitly ruled that the explanations offered by the prosecution were credible, believable, and race- and/or gender-neutral.

Given that, because the "trial court's findings on the issue of discriminatory intent largely turn on an evaluation of the prosecutor's credibility," United States v. Sneed, 34 F.3d 1570, 1579 (10th Cir. 1994), they are factual findings that are presumptively correct under the AEDPA. "[E]valuation of the

-26-

prosecutor's state of mind based on demeanor and credibility lies 'peculiarly within a trial judge's province.'" Hernandez, 500 U.S. at 365 (quoting Wainwright v. Witt, 469 U.S. 412, 428 (1985)). See Eagle v. Linahan, 279 F.3d 926, 941 (11th Cir. 2001) ("[R]eviewing [a Batson] claim . . . require[s] us to look over the trial court's shoulder, reconstructing the circumstances surrounding the voir dire of the venire persons . . . to decide whether the court correctly determined that the defendant had not raised an inference that the prosecution used its peremptory challenges to remove jurors on account of their race."). The trial court's implicit finding that the prosecution had offered credible race- and/or gender-neutral explanations for its use of peremptory strikes in Saiz's trial has not been rebutted by clear and convincing evidence. Thus, the Colorado Court of Appeals' conclusion that the trial court properly determined that Saiz failed to show purposeful discrimination is not an unreasonable determination of the facts.

We also reject her argument based on the final composition of the jury. The Colorado Court of Appeals did note that the final jury contained a number of Hispanic and female jurors. "The presence of members of the subject gender on the final jury 'is a relevant factor in negating an alleged Batson violation when the [exercising party] has the opportunity to strike the juror.'" Davey v. Lockheed Martin Corp., 301 F.3d 1204, 1216 (10th Cir. 2002) (emphasis omitted) (quoting United States v. Johnson, 4 F.3d 904, 913-14 (10th Cir. 1993)). It is

only a factor, however, and is not dispositive. We do not interpret the state court's ruling as placing exclusive reliance on that factor. Rather, the appellate court was aware that the trial court had heard the prosecution's explanations for its peremptory challenges and had found them credible. The added fact that the final jury contained members from the same groups against whom the disputed peremptory challenges had been exercised simply reinforced the conclusion that Saiz failed to carry her ultimate burden to show "purposeful discrimination."

We therefore conclude that the result of the Colorado Court of Appeals' decision—that Saiz's Equal Protection rights under <u>Batson</u> were not violated—is not contrary to or an unreasonable application of federal law, nor did it involve an unreasonable determination of the facts in this case.

## II. Fifth Amendment Claim

After Saiz entered an initial plea of not guilty by reason of insanity, the trial court ordered a psychiatric examination pursuant to Colo. Rev. Stat. § 16-8-106. Dr. Morall examined Saiz and produced two reports, concluding in both that Saiz was legally sane when she killed her husband.

At her trial on the substantive charges,[10] the prosecution sought to call Dr. Morall to testify as a rebuttal witness for the prosecution, critiquing the defense expert witnesses who testified that Saiz suffered from battered woman's syndrome and post-traumatic stress disorder. Saiz sought to exclude Dr. Morall's testimony, arguing that it was inadmissible under Colo. Rev. Stat. § 16-8-107(1) which "prohibits the prosecution from using, at trial on the substantive offense, evidence first derived from communications made by a defendant during a sanity examination." Saiz, 923 P.2d at 203. The trial court ruled that Dr. Morall could testify at Saiz's trial relying upon "the evidence she heard at the . . . sanity trial, relying upon any reports or documents she may have read, including the reports and documents from the defense psychiatrist, police reports, reports of other psychologists and psychiatrists . . . [b]ut . . . not . . . upon her four-hour interview with Ms. Saiz, at the Colorado State Hospital." Tr. of Jury Trial, R. Vol. 37 at 203-04.

On direct appeal, Saiz argued that (a) it was impossible for Dr. Morall to not utilize the information she gained from her interview with Saiz; and (b) without that information, Dr. Morall would have had insufficient information

---

[10]Saiz first had a sanity trial, at which the jury determined she was legally sane.

upon which to base her opinion.  The Colorado Court of Appeals rejected both arguments.

With respect to the argument that it was humanly impossible to ignore the information gathered from the interview, the state court stated "defendant has not pointed to any instance in the record in which the prosecution presented evidence, through the psychiatrist's testimony, that was acquired for the first time from a communication derived from defendant's mental processes during the course of the court-ordered examination." Saiz, 923 P.2d at 203.  With respect to the argument that, without the information from the interview, Dr. Morall's testimony lacked an adequate foundation, the court stated:

> [W]e note that an expert witness may base an opinion on facts or data which is not admissible into evidence, provided that it is of the type reasonably relied upon by experts in the particular field.
>
> Here, defendant does not argue that forensic psychiatrists do not reasonably rely upon police reports, witness statements, videotaped interviews, and the reports of other experts in forming an opinion as to whether an individual suffers from battered woman's syndrome or post-traumatic stress disorder.  In addition, because the psychiatrist disagreed with the conclusions of defendant's experts, she did not impermissibly base her conclusions on the opinions of other experts.

Id. (citation omitted).

The federal district court agreed:  "[Saiz] provides this court with no factual substantiation for her perfunctory contention that it would be impossible

-30-

for [Dr. Morall] to separate the knowledge gleaned from the interview from her final opinion." Order at 17 (internal quotation omitted).

Saiz argues cursorily that permitting Dr. Morall to testify violated her Fifth Amendment right against self-incrimination. On appeal, she again fails to identify any testimony or evidence in the record supporting her assertion that Dr. Morall relied upon information gleaned from her interview with Saiz when testifying at Saiz's trial. Without citation to authority, she asserts that the government bears the burden of proving that Dr. Morall's testimony was not influenced by Saiz's statements in the court-ordered examination. With respect to her argument that Dr. Morall's opinion had an insufficient foundation absent reliance on the prohibited court-ordered examination, Saiz concedes that psychiatrists can rely on police reports, and she fails to demonstrate why the other materials upon which Dr. Morall relied were somehow improper.

Under the AEDPA, Saiz must show that the Colorado Court of Appeals' decision was "contrary to, or involved an unreasonable application of, clearly established Federal law" or was "based on an unreasonable determination of the facts." 28 U.S.C. §§ 2254(d)(1), (2). She has failed to do so. We therefore deny her habeas petition on this ground.

## III.    Sixth Amendment Claim

Saiz argues that her Sixth Amendment right to confrontation was violated when the trial court restricted her cross-examination of Dr. Morall by (a) prohibiting cross-examination relating to Dr. Morall's involvement as a prosecution advisor in a highly publicized unrelated murder trial; (b) prohibiting cross-examination relating to a case where Dr. Morall was found in contempt of court and derelict in her duties as a forensic expert; and (c) prohibiting surrebuttal opinion testimony as to Dr. Morall's character and reputation for truthfulness.

"The right to cross-examine witnesses is an integral part of the broader Sixth Amendment right to confront witnesses directly in a criminal trial." United States v. Oliver, 278 F.3d 1035, 1041 (10th Cir. 2001). In particular, "'the exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.'" Delaware v. Van Arsdall, 475 U.S. 673, 678-79 (1986) (quoting Davis v. Alaska, 415 U.S. 308, 316-17 (1974)). Nevertheless, "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." Id. at 679. "[T]he Confrontation Clause guarantees an *opportunity* for effective cross-examination, not cross-examination that is

effective in whatever way, and to whatever extent, the defense might wish." Id. (internal quotation omitted).

### A. Unrelated Murder Trial

Dr. Morall had been a prosecution advisor in the unrelated murder trial of James King.[11] She had prepared some written materials in the King case, which provided advice to the prosecution on various matters. When defense counsel attempted to cross-examine her with respect to statements in the written materials, the trial court sustained a prosecution objection. Tr. of Jury Trial, R. Vol. 39 at 161-62.

Saiz argues the court impermissibly restricted her right to cross-examine Dr. Morall, in violation of her rights under the Confrontation Clause. On direct appeal the Colorado Court of Appeals rejected this argument, concluding that "because the memorandum concerned the psychiatrist's involvement in another case, it was, at most, only marginally relevant," and in any event, "the trial court allowed liberal cross-examination on the subject of the psychiatrist's involvement in the other criminal trial generally." Saiz, 923 P.2d at 204. The district court below also rejected this claim:

---

[11]James King had been represented by the same attorney who represents Saiz in this case, Walter Gerash.

The record indicates that the trial court's decision to prohibit the use of the memorandum as only marginally relevant, while still providing the defense with ample opportunity to explore any possible bias on the part of Dr. Morall, is not contrary to or an unreasonable application of the standards for placing reasonable limits on the Sixth Amendment right to cross-examination articulated in Van Arsdall.

Order at 22-23 (citation omitted). After conducting our own independent review of the record, we agree with the district court that the Colorado Court of Appeals' determination that Saiz's Sixth Amendment rights were not violated by the limits placed on her cross-examination of Dr. Morall concerning Dr. Morall's involvement in the King case was not contrary to or an unreasonable application of federal law.

## B. Contempt of Court Case

Saiz next argues that the trial court violated her Sixth Amendment right when it prevented defense counsel from cross-examining Dr. Morall regarding a default judgment obtained against Dr. Morall, the entry of a contempt of court order for failure to appear and the resulting issuance of a warrant for her arrest, all stemming from another case in which Dr. Morall and the attorney involved evidently had a fee dispute. Saiz argues she should have been able to cross-examine Dr. Morall on this matter to impeach her credibility and her qualifications as a forensic expert. The trial court refused to let Saiz cross-examine Dr. Morall on this issue, concluding that it would lead to "confusion of

-34-

facts" and was "not really crucial in this case." Tr. of Jury Trial, R. Vol. 39 at 170.

The Colorado Court of Appeals upheld that refusal, stating that the ruling "was within the court's permissible scope of discretion." Saiz, 923 P.2d at 204. The district court below found no basis on which to grant a writ:

> [T]he trial court's exercise of its 'wide latitude to place reasonable limits on cross-examination' based upon concerns about confusion of issues is not contrary to or an unreasonable application of the standards pertinent to the Sixth Amendment right to cross-examination articulated in Van Arsdall, 475 U.S. at 679. Although the state appeals court did not cite to Van Arsdall, such citation is not required, so long as neither the reasoning nor the result of the state court decision contradicts Van Arsdall. See Early v. Packer, 123 S. Ct. 362, 365 (2002).

Order at 23-24. After conducting our own independent review of the record, we conclude that the state court decision is not contrary to nor an unreasonable application of federal law.


### C. Surrebuttal Opinion Testimony

Finally, Saiz contends that her Sixth Amendment right to confrontation was violated when the trial court prohibited surrebuttal opinion testimony by two defense attorneys who were familiar with Dr. Morall and would have testified as to her character and reputation for truthfulness. The trial court ruled that Dr. Morall's truthfulness was not at issue, since she was testifying as to her expert

-35-

opinion rather than testifying as to facts. Therefore, since her truthfulness was not relevant, the court ruled that the surrebuttal testimony would not be permitted under Colo. R. Evid. 608(a).[12]

The Colorado Court of Appeals held that "because CRE 608(a) makes no exception for expert witnesses, we conclude that the trial court's ruling was erroneous." Saiz, 923 P.2d at 204. The court determined, however, that the error was harmless beyond a reasonable doubt:

> [T]he psychiatrist's testimony was not crucial to the prosecution's case because other expert witnesses also testified that the results of defendant's psychiatric tests suggested that she did not suffer from battered woman's syndrome or post-traumatic-stress disorder. Also, the trial court had permitted extensive cross-examination of the psychiatrist. Moreover, there was other evidence overwhelmingly supporting the verdict and overcoming defendant's theory of self-defense, including evidence that defendant shot her husband while he was sleeping, tried to cover up the homicide instead of reporting it, and stood to receive a large amount of insurance money upon his death.

Id.

---

[12]Colo. R. Evid. 608(a) provides:

**(a) Opinion and Reputation Evidence of Character.** The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

In Saiz's first federal habeas proceeding, she prevailed on this issue.  The

federal district court found that "the Colorado Court of Appeals' decision that Dr.

Morall's testimony was not crucial to the prosecution's case is factually

incorrect."  Saiz v. McGoff, No. CIV. A. 98-D-68, 2001 WL 629663, at *4 (D.

Colo. May 23, 2001).  The court further held that the error was not harmless

beyond a reasonable doubt.  After we remanded that decision to the district court

for further review on the ground that the court had applied the wrong standard

under the AEDPA,[13] the federal district court held that, under 28 U.S.C.

§ 2254(d)(1), the Colorado Court of Appeals' conclusion that the trial error was

harmless beyond a reasonable doubt was *not* an unreasonable application of the

harmless-error analysis in Chapman:

> The state appellate court applied the correct legal standard in
> determining (1) that Dr. Morall's testimony was not critical to the
> prosecution's case, (2) that other expert witnesses corroborated Dr.
> Morall's testimony that Ms. Saiz did not suffer from battered
> woman's syndrome or post-traumatic stress disorder, (3) that
> extensive cross-examination of Dr. Morall had been permitted, and
> (4) that other evidence, including that Ms. Saiz shot her husband
> while he was asleep, tried to cover up the homicide, and stood to

---

[13]As indicated above (see note 1, supra"), we held that the district court had erroneously determined that the state appellate court's Chapman harmless-beyond-a-reasonable-doubt analysis was "incorrect."  The correct standard is whether the Chapman analysis was "objectively unreasonable."  Saiz, 296 F.3d at 1012.  We also held that the district court had erroneously reviewed the harmless error analysis under 28 U.S.C. § 2254(d)(2), which applies to a state court's factual findings, rather than under 28 U.S.C. § 2254(d)(1), which applies to mixed questions of law and fact such as the harmless error inquiry.

receive a large amount of insurance money upon his death, overwhelmingly supported the jury's verdict and overcame the defendant's self-defense theory. However, I disagree with the first and second conclusions, as I did in my May 23, 2001, order granting habeas corpus relief, because I find that Dr. Morall's testimony was critical to the prosecution's case, that her testimony was not cumulative, and that other expert witnesses did not also testify that the results of Ms. Saiz's psychiatric tests suggested that she did not suffer from battered woman's syndrome or post-traumatic stress disorder. Despite this disagreement, I find that the Colorado Court of Appeals' application of the Chapman standard in reaching its ultimate conclusion is not objectively unreasonable. I reach this determination because I do not find that the appellate court's conclusions with which I disagree outweigh its two remaining conclusions, i.e., that extensive cross-examination of Dr. Morall had been permitted and that other evidence overwhelmingly supported the jury's verdict and overcame the defendant's self-defense theory.

Order at 26-27. Saiz argues the district court erred in reaching that conclusion.

Assuming that it was an error to refuse to permit the surrebuttal witnesses to testify as to Dr. Morall's reputation for truthfulness, all parties agree that the relevant inquiry is whether the Colorado Court of Appeals' conclusion that that error was harmless beyond a reasonable doubt is contrary to or an unreasonable application of Chapman. After carefully reviewing the record, we conclude that it was not, for substantially the reasons stated in the federal district court's order.

**CONCLUSION**

For the foregoing reasons, the district court's denial of Saiz's petition for a writ of habeas corpus is AFFIRMED.

-38-

03-1292 - <u>Saiz v. Ortiz</u>

**HARTZ**, Circuit Judge, concurring:

I join Judge Anderson's opinion.  I write separately to make two observations.

The first relates to Saiz's Fifth Amendment claim.  We resolve the claim by deferring to the state court's determination that there is no evidence that Dr. Morall's testimony relied at all on her interview with Saiz.  It is worth emphasizing, however, that our opinion does not suggest that Saiz would have a Fifth Amendment claim if Dr. Morall's testimony had in fact relied on the interview.  One can make a strong argument that when a defendant raises any defense (not just insanity) that relies on an expert examination of the defendant's mental condition, the Fifth Amendment does not protect the defendant from being compelled to submit to a similar examination conducted on behalf of the prosecution, and, of course, evidence from that examination could be used to rebut the defense.  In particular, the prevailing view in the courts appears to be that court-ordered mental examinations are permissible when the defendant raises a battered-woman-syndrome defense.  *See, e.g., Hess v. Macaskill*, 67 F.3d 307 \*\*2-3 (9th Cir. 1995) (unpublished); *State v. Briand*, 547 A.2d 235 (N.H. 1988).  *See generally* Erin M. Masson, Annotation, *Admissibility of Expert or Opinion Evidence of Battered-Woman Syndrome on Issue of Self-Defense*, 58 A.L.R.5th

749, § 9 (2004).  Testimony by Dr. Morall relying on her interview with Saiz may have violated the Colorado rules of evidence, but violation of state law is not a ground for federal habeas relief.

Second, although our panel opinion follows repeated circuit precedent regarding our standard of review of those factual findings of the district court that are based on the state-court record, it may be worth mentioning that this precedent appears to be incorrect.  Our opinion, *supra* at 18, quotes the following from *Allen v. Mullin*, 368 F.3d 1220, 1234 (10th Cir. 2004):  "If the district court's factual findings depend entirely on the state court record, we independently review that record."  I was on the *Allen* panel and joined the opinion.  But even better authority than that would not make it right.  For authority for the quoted proposition, *Allen* relied on *Walker v. Gibson*, 228 F.3d 1217, 1225 (10th Cir. 2000), which, without any discussion of the matter, relied on *Smallwood v. Gibson*, 191 F.3d 1257, 1264 n.1 (10th Cir. 1999), which, without any discussion, relied on *Cunningham v. Diesslin*, 92 F.3d 1054, 1062 n.6 (10th Cir. 1996), which, without any discussion, relied on *Archuleta v. Kerby*, 864 F.2d 709, 711 n.2 (10th Cir. 1989), which in turn relied on *Castleberry v. Alford*, 666 F.2d 1338, 1342 n.2 (10th Cir. 1981), which said:

> Fed. R. Civ. P. 52(a) provides:
>
> Findings of fact shall not be set aside unless clearly
> erroneous, and due regard shall be given to the

> opportunity of the trial court to judge of the credibility
> of the witnesses.

It is a well-established rule that factual questions in habeas corpus proceedings should be determined by the district court and that its factual conclusions are binding on the court unless "clearly erroneous." There is an exception to the general rule, however, where some or all of the evidence before the district court was not the live testimony of witnesses, but instead transcripts and documents of the state proceedings. In such circumstance, the clearly erroneous rule will not apply with full force. *See Martinez v. Turner*, 461 F.2d. 261, 264 (10th Cir. 1972).

About three years later, however, the Supreme Court rejected the view

expressed in *Castleberry*. In *Anderson v. City of Bessemer City*, 470 U.S. 564,

574-75 (1985), the Court said.

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much. As the Court has stated in a different context, the trial on the merits should be "the 'main event' . . . rather than a 'tryout on the road.'" *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977). For these reasons, review of factual findings under the clearly-erroneous standard—with its deference to the trier of fact—is the rule, not the exception.

Moreover, Fed. R. Civ. P. 52(a) has explicitly adopted the same approach as

*Anderson* and now states: "Findings of facts, *whether based on oral or*

*documentary evidence,* shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses." (emphasis added).

I realize that the Federal Rules of Civil Procedure do not necessarily apply to habeas cases. *See* Rules Governing Section 2254 Cases, Rule 11. But one would think that the reasoning of *Anderson* still applies. None of the differences between habeas cases and other civil actions would seem to justify less deference to fact finding by the federal trial court. AEDPA does not address the matter (although it certainly limits the occasions for the district court to engage in fact finding). And none of our precedents relies on the unique nature of habeas cases to justify less deferential review. On the contrary, *Martinez*, the case relied on by *Castleberry* as authority, itself relied on two nonhabeas cases. *Martinez* said:

> Since the record consists solely of the transcripts and the photograph, we are in as good a position as the trial court to evaluate the evidence. Nevertheless, even where the record is wholly documentary our scope of review is enlarged only to the extent that no regard need be given the opportunity of the trial court to observe witnesses, and in such cases we nevertheless do not disturb the findings unless we have a definite and firm conviction that a mistake has been made. *Mid-Continent Casualty Co. v. Everett*, 340 F.2d 65, 70 (10th Cir. [1965]); *Sta-Rite Industries, Inc. v. Johnson*, 453 F.2d 1192 (10th Cir. [1972]).

461 F.2d at 264. Actually, if we returned to what *Martinez* said, we would probably be about right.